**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 19-cv-02437-DDD-NYW

DIANA SANCHEZ;
J.S.M., by and through his mother DIANA SANCHEZ,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER, COLORADO, *et al.*,

      Defendants.

---

**PLAINTIFFS' COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**

---

## I.    INTRODUCTION

On July 31, 2018, Plaintiff Diana Sanchez gave birth to a baby boy, Plaintiff J.S.M. But

what should have been one of the happiest days of her life was instead a day of unnecessary

terror, pain, and humiliation that continues to cause her on-going emotional trauma. Ms. Sanchez

was forced to deliver Baby J.S.M. on a cold, hard bench, feet away from a toilet, in a jail cell at

the Denver County Jail, all alone and with no medical supervision or treatment. Ms. Sanchez had

to endure this horrific experience despite the fact that multiple Denver Health nurses and Denver

sheriffs knew that: (1) she had been in active labor for hours, (2) she was days away from her

due date, (3) she had a high risk pregnancy, and (4) her water had broken hours before. Instead

of ensuring that Ms. Sanchez gave birth in with medical assistance in a safe and sanitary setting,

Denver Health nurses and Denver sheriffs callously made her labor alone for hours, and

ultimately give birth alone in a dirty jail cell without any medical care, because it was

*inconvenient* to take her to the hospital during the jail's booking process. Once Baby J.S.M.

1

arrived, Defendants were totally unequipped to care for him. The outrageous conduct by Denver

Health and Denver, and their respective officials, violated Ms. Sanchez's and Baby J.S.M.'s

constitutional rights.

## II.   STATEMENT OF FACTS

### A. <u>Plaintiffs Have More Than Adequately Pled Facts Demonstrating Defendants' Deliberate Indifference To Their Obvious Serious Medical Needs</u>[1]

On July 14, 2018, Ms. Sanchez was booked into the Denver County Jail.  During the

booking process, Ms. Sanchez was interviewed by Denver Health personnel, who noted on her

Denver Sheriff Department's Health Services Questionnaire that she was over eight months

pregnant. Denver Health personnel also noted that Ms. Sanchez's due date was August 9, 2018.

It was noted in her medical record that Ms. Sanchez had bacterial vaginosis, a urinary tract

infection, and was 30% effaced and 1-2 cm dilated, but had not been having contractions.

Bacterial vaginosis is associated with an increased risk of premature birth. According to

Defendants' records, Ms. Sanchez was in the early stages of a complicated labor. ¶¶18-21.

On July 30, 2018, Ms. Sanchez was examined by a Denver Health nurse. The nurse

advised Ms. Sanchez that she needed to ensure that she received medical attention *immediately* if

she started having contractions or if she noticed any fluid leaking from her vagina. ¶22

Early the next morning, Ms. Sanchez alerted Denver deputies (who in turn alerted Denver

Health nurses) that she was in active labor. At approximately 5:00 a.m., Ms. Sanchez told the

deputy who delivered her breakfast that she had been experiencing contractions that morning.

Ms. Sanchez spoke with Denver deputies and Denver Health nurses at least eight times that

morning, informing them each time that she was experiencing contractions. For the next 4-5

hours, Ms. Sanchez labored alone in her cell while Denver and Denver Health failed to provide

---

[1] Citations in this section are to the Complaint [Doc.#1].

medical care or transport her to a hospital. The entirety of Ms. Sanchez's long and painful labor was readily obvious to both Denver and Denver Health jail staff who were responsible for monitoring her via a live video feed from her cell.  ¶¶23-26.

At approximately 9:43 a.m., as Ms. Sanchez's labor pains became even more acute, she again clearly alerted Denver jail staff that childbirth was imminent. Ms. Sanchez informed Deputy Wherry that her water had broken and she was experiencing abdominal pain. In response to Ms. Sanchez's clear notification that she was in labor, Deputy Wherry contacted Nurse Chacon and relayed what Ms. Sanchez had told her. Nurse Chacon examined Ms. Sanchez and noted in her medical chart that: (1) Ms. Sanchez reported that she had been experiencing contractions since 5:00 a.m. (and that the contractions had been constant), (2) her underwear was wet and bloody, and (3) Ms. Sanchez's report that her water had broken. Denver deputies and Nurse Chacon knew almost an hour before Ms. Sanchez gave birth that her water had broken, she was in active labor, and that the delivery of her child was imminent. Instead of providing Ms. Sanchez and her baby immediate medical attention, Deputy Wherry and Nurse Chacon deliberately chose to take a "wait and see" approach, as though it were not patently obvious to anyone – with or without medical training – that Ms. Sanchez was in labor and required immediate medical attention. ¶¶27-30.

Shortly after speaking with Ms. Sanchez at 9:43 a.m., Deputy Wherry took a meal break without ensuring that Ms. Sanchez was transported to an appropriate medical facility. Nurse Chacon remained on duty, but utterly failed Ms. Sanchez by not ordering an ambulance, even though she knew that (1) Ms. Sanchez had been reporting to jail and medical staff "constant" contractions that had begun nearly five hours earlier, (2) her water had clearly broken, and (3) she was bleeding vaginally. Instead, Nurse Chacon only provided Ms. Sanchez an absorbent pad.

Nurse Chacon then informed Deputy Hart of the symptoms that Ms. Sanchez was experiencing and requested a *non-emergent* van run to the hospital. Nurse Chacon later told Deputy Albee that she knew that Ms. Sanchez's water had broken prior to the ordering of the non-emergent van run. ¶¶31-32.

By this time, Deputy Hart had already been alerted by Ms. Sanchez multiple times, and was already well aware that she was in active labor (even without the additional information from Nurse Chacon). At approximately 10:20 a.m., Deputy Hart contacted Sergeant Garcia about Ms. Sanchez's symptoms – including her report that her water had broken – and requested a non-emergent van run. Sergeant Garcia asked Deputy Hart if Ms. Sanchez had been seen by medical staff because he knew that if Ms. Sanchez's water had broken, they needed to request an ambulance. Denver sheriffs knew what was obvious even to a layperson: that Ms. Sanchez's water breaking was an extremely obvious sign that she needed to be taken emergently to the hospital by ambulance. ¶¶33-34.

Despite this, neither Deputy Hart nor Sergeant Garcia (nor any Defendant, for that matter) took any action to ensure that an ambulance was called for Ms. Sanchez. Instead, Sergeant Garcia ordered the non-emergent van run despite knowing that "book-ins" had just begun, and that the logistics of jail operations dictated that book-ins would be completed before a non-emergent van run to the hospital would be made. Thus, Sergeant Garcia knew it would take at least an hour, but likely multiple hours, before Ms. Sanchez would be taken to the hospital. At Sergeant Garcia's request, Deputy Hart told Nurse Chacon that book-ins would end at 11:00 a.m. at the earliest, and 12:00 p.m. at the latest. Still, Nurse Chacon told Deputy Hart (who told Sergeant Garcia) that the non-emergent van run was fine. ¶¶35-37.

During this same time period, Deputy Albee and Deputy Hart had conversations about Ms. Sanchez, during which both acknowledged their awareness that she needed immediate emergency medical attention. Deputy Albee and Deputy Hart discussed the fact that Ms. Sanchez's water had broken and speculated as to why she was not being transported via ambulance. Despite this knowledge that Ms. Sanchez needed to be transported to a hospital immediately, Deputy Albee and Deputy Hart did not call for an ambulance or in any other way ensure that she received immediate emergency transportation to an appropriate medical facility. Throughout this entire time, Ms. Sanchez's painful labor was obvious to jail and medical staff alike, via a video feed from her cell. ¶¶39-40.

At 10:36 a.m., Ms. Sanchez screamed from her cell. She was in the throes of labor. Deputy Wherry (who had returned from her break) heard Ms. Sanchez's cries for help and, when she got to Ms. Sanchez's cell, observed that the absorbent pad was soaked. Deputy Wherry immediately informed Nurse Herch that the absorbent pad was soaked and that Ms. Sanchez was clearly in excruciating pain. By this time, Denver sheriffs and Denver Health's nursing staff was aware that Ms. Sanchez had been in labor for nearly five and a half hours. ¶¶41-42.

Despite the obvious urgency of the situation, Nurse Herch failed to do **anything at all** to assist Ms. Sanchez. Astoundingly, Nurse Herch responded that Ms. Sanchez was already scheduled to go to the hospital and, therefore, did not need any medical care. Deputy Wherry informed Nurse Herch that the van run would be on a non-emergent basis and that Ms. Sanchez was about to experience childbirth. Nurse Herch lackadaisically acknowledged that he was aware of this fact, but told Deputy Wherry that Ms. Sanchez would simply have to wait for the non-emergent van run and for the booking process to end. ¶43

Despite knowing that Nurse Herch was going to do nothing to ensure that Ms. Sanchez or her baby received necessary immediate and emergent medical care, Deputy Wherry did not take any other actions to ensure that Ms. Sanchez or her baby received the medical care that they obviously needed (including informing her supervisors, nursing supervisors, or simply calling 911). Deputy Wherry knew that Ms. Sanchez would give birth prior to the end of the booking process and, in anticipation of having to help deliver Ms. Sanchez's child, donned gloves and returned to her post just outside Ms. Sanchez's cell. Despite this knowledge, Deputy Wherry did not call for an ambulance. ¶¶44-45.

By 10:42 a.m., Ms. Sanchez was screaming in pain, and Nurse Herch was still at the nursing station. Frustrated with Nurse Herch's slow response, Deputy Wherry sent Deputy Hart to get him. Nurse Herch was on the phone and told Deputy Hart not to bother him until he was off the phone. Having observed Nurse Herch's dogged refusal to care for Ms. Sanchez (and Baby J.S.M., who was clearly on the way), Deputy Wherry called for other nurses who had gone to help with book-ins. However, she still did not call for emergent transport of Ms. Sanchez to a hospital. ¶¶46-47.

Realizing that no medical care was forthcoming, and that she could wait no longer, Ms. Sanchez removed her underwear and prepared to deliver the Baby J.S.M. on her own. This too, was captured by the video feed from Ms. Sanchez's cell, yet no medical care was provided to her. Ms. Sanchez yelled that the baby was coming, and Deputy Wherry could see that the baby was crowning. Deputy Wherry waved her arms and yelled at Nurse Herch to come immediately because the baby was coming. Deputy Wherry also, again, yelled over the radio for the other nurses to return to medical to assist Ms. Sanchez. No nurse would arrive until after Ms. Sanchez had delivered her baby. ¶¶48-49.

6

Ms. Sanchez and Baby J.S.M. were totally alone as she labored and as she gave birth; surveillance camera footage confirms that the last time a nurse had seen Ms. Sanchez was approximately an hour beforehand at approximately 9:53 a.m., even though she had been screaming in pain and begging the deputy at her door to get help as the birth approached. Despite the obvious urgency of the situation, Denver Health nurses and Denver sheriffs did nothing to ensure that she was provided medical care during the birth of Baby J.S.M. Ms. Sanchez delivered Baby J.S.M. on the bench in her cell without any medical assistance or care whatsoever. ¶¶50-51.

Only after Ms. Sanchez delivered Baby J.S.M. did Nurse Herch casually *stroll* over to the cell. When he eventually arrived, Nurse Herch awkwardly took Baby J.S.M. and patted him on the back. Denver and Denver Health failed to provide Baby J.S.M. with even the most basic post-delivery medical care. Nurse Johnson, the next nurse to arrive, asked for clamps to assist in severing the umbilical cord, and Sergeant Moore relayed this request to the rest of the nursing staff. Despite multiple requests, no clamps were found.  No nurse at the jail ever clamped or severed the umbilical cord. A few minutes later, Nurse Johnson requested an "OBGYN Kit". Despite the extensive, hours-long notice of Ms. Sanchez's labor, the nursing staff had not accessed the kit prior to the actual birth of Baby J.S.M. Deputy Wherry and Sergeant Moore accompanied Nurse Knuppel to the office to retrieve the kit, which was missing the clamps. In fact, Denver Health nurese never came up with the necessary equipment and were unable to clamp the umbilicus. ¶¶52-58.

For two minutes after the birth, no nurse dried or warmed Baby J.S.M. For several minutes (or more), no nurse at Denver County Jail took the obvious and necessary medical actions of clearing the mucus from Baby J.S.M.'s nose and mouth, applying antibiotic or

antiseptic eyedrops to prevent eye infection, providing a vitamin K injection, providing a cap to warm his head, providing a hepatitis B virus vaccine, providing necessary care to address risk factors to Baby J.S.M. associated with Ms. Sanchez's use of prescribed methadone, or other high-risk prenatal issues, weighing or otherwise measuring Baby J.S.M, taking any action to evaluate or treat Ms. Sanchez's boggy uterus, or providing Baby J.S.M. with an identifying medical bracelet. Denver's and Denver Health's failure to provide Baby J.S.M. and Ms. Sanchez with even the most basic post-delivery care was not just negligent, it was deliberately indifferent to their obvious, serious medical needs. ¶¶59-69.

Had the nursing staff simply taken Ms. Sanchez seriously when she initially told Nurse Chacon that her water had broken and that she had been experiencing contractions, Denver sheriffs and Denver Health could easily have transported her to DHMC before giving birth. Denver and Denver Health knew that Ms. Sanchez was only days short of her due date, with multiple risk factors for premature delivery. Both Denver sheriffs and Denver Health nursing staff certainly were aware that she could go into labor at any time. ¶70.

The setting of Ms. Sanchez's cell was plainly inappropriate and dangerous for delivery, both for Ms. Sanchez and for Baby J.S.M. Denver County Jail's medical unit lacked the trained personnel and medical equipment necessary to address the numerous, potentially medically complicated emergency situations that could have accompanied any birth, and particularly a high-risk birth faced by Ms. Sanchez and Baby J.S.M. The facility's OBGYN was on vacation during the week of this incident, apparently without any substitute coverage. Absent this critical staff member, the Denver County Jail's medical staff was even less prepared to deal with any potential complications of Ms. Sanchez's pregnancy or delivery than ordinarily it would have been. Despite knowing that Ms. Sanchez was less than a week from term (of a high-risk

pregnancy), Denver and Denver Health did nothing to ensure that there was an OBGYN on-duty at the Denver County Jail. ¶¶76-77.

The Denver Health nursing staff had not even accessed the facility's limited "delivery kit" prior to Ms. Sanchez's delivery and Baby J.S.M.'s birth, despite being on notice that Ms. Sanchez was in active labor for hours, and had to run to retrieve it *after* Ms. Sanchez had already given birth to Baby J.S.M. ¶78.

Ultimately, Denver sheriffs and Denver Health nurses unjustifiably delayed transporting Ms. Sanchez to the hospital, simply to accommodate the jail's scheduled book-ins. The book-ins could have waited; Ms. Sanchez and Baby J.S.M. could not. As Baby J.S.M. arrived, Nurse Herch could not be bothered to so much as acknowledge Ms. Sanchez's existence. Ms. Sanchez endured the physical and emotional agony of childbirth alone, a few feet from a toilet bowl, on a thin jail mattress soaked with blood and amniotic fluid, because Denver sheriffs and Denver Health nurses responsible for her care decided to risk her well-being and that of Baby J.S.M. rather than go to the trouble of calling an ambulance. ¶¶74-75.

**B.  Facts Demonstrating Ms. Sanchez Was A Pretrial Detainee**

At the time she gave birth to Baby J.S.M., Ms. Sanchez was being held by Denver on a warrant and in anticipation of her probation revocation hearing, which had not yet occurred. **Exhibit 1**, *CoCourts Documents*. She would have that hearing days *after* giving birth, on August 2, 2019. *Id.*

**III.**                                    **STANDARD OF REVIEW**

"There is a strong presumption against the dismissal of claims under [Fed. R. Civ. P. 12(b)(6)]." *Blevins v. Reid*, 2008 U.S. Dist. LEXIS 46168, at *9 (D. Colo. June 12, 2008)(citing *Cottrell, Ltd. v. Biotrol Intern., Inc.*, 191 F.3d 1248, 1251 (10th Cir. 1999)). Evaluating a Rule 12(b)(6) motion, a court must accept as true "all well-pleaded factual allegations in a complaint

and view these allegations in the light most favorable to the plaintiff." *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011)(citation omitted). Generally, a complaint will survive a Rule 12(b)(6) motion if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Plausible" does not mean "likely to be true," but is, instead, a nudge beyond "conceivable." *See Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

Courts have rejected a heightened pleading standard for claims of municipal liability. Rather, a well-pleaded claim of municipal liability is one that simply "provide[s] fair notice to the defendant, [which] requires more than generically restating the elements of municipal liability." *Taylor v. RED Dev., LLC*, 2011 U.S. Dist. LEXIS 97985, at *9 (D. Kan. Aug. 31, 2011).

> The reasons for not requiring heightened fact pleading in a § 1983 municipal liability complaint remain even in the wake of *Twombly* and *Iqbal*: a plaintiff, as an outsider to municipal government, is not expected to have information about a city's official policies, practices, or training programs at the pleading stage.

*Walker v. Zepeda*, 2012 U.S. Dist. LEXIS 74386, at *14 (D. Colo. May 29, 2012)(Ebel, J). "To require more could foreclose legitimate § 1983 claims that, after appropriate discovery, turn out to have evidentiary support." *Id.* at *15-16.

## B. Evidence Outside The Complaint Must Not Be Considered On A Motion to Dismiss

Defendants attempt to circumvent the procedural safeguards inherent in a motion to dismiss under 12(b)(6) by improperly asking the Court to evaluate a single piece of evidence (the video) rather than assuming the truth of Plaintiffs' allegations, as it is required to do. When ruling on a Rule 12(b)(6) motion, a court may not look beyond the contents of the complaint unless extrinsic material attached to the motion is "central" or "integral" to the plaintiff's claims. *MacArthur v. San Juan County*, 309 F.3d 1216, 1221 (10th Cir. 2002). That is not the case here.

"Simply because a video that captured the events complained of in the complaint exists does not transform that video into a 'document' upon which the complaint is based." *Slippi-Mensah v. Mills*, No. 1:15-cv-07750-NLH-JS, 2016 U.S. Dist. LEXIS 124719, at *6 (D.N.J. Sep. 14, 2016). Here, Plaintiffs' claims are not based on the video, but rather on Defendants' ***conduct*** that will be demonstrated by *multiple* sources of evidence. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (finding that what is critical to whether a court may consider evidence attached to a motion to dismiss "is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited"). Plaintiffs did not attach the video to their Complaint or refer to it (other than recognizing that Ms. Sanchez's labor and the birth of her son were captured by a live-feed and, therefore, the law enforcement officials and nurses saw what was happening at the time).

The weight of authority militates against this Court considering the video attached by Defendants in ruling on their motions to dismiss. *Estate of Holmes v. Somers*, 387 F. Supp. 3d 1233, 1243-44 (D. Kan. 2019) (declining "to consider the videos [attached to defendants' motions to dismiss] in deciding the motions to dismiss"); *Robles v. Aguilar*, No. 16-cv-07038-MEJ, 2017 U.S. Dist. LEXIS 34842, at *6 (N.D. Cal. Mar. 10, 2017) (declining to consider the video attached to defendant's motion to dismiss); *Garrett v. Crawford*, 2016 U.S. Dist. LEXIS 24868, at *9 (W.D. Tex. Mar. 1, 2016) (examining dash cam footage of incident "would be inappropriate . . . when considering a motion to dismiss"); *Gersbacher v. City of N.Y.*, 134 F. Supp. 3d 711, 718-20 (S.D.N.Y. 2015) ("[W]here courts have considered video evidence in conjunction with 12(b)(6) motions, the video has either been offered by the plaintiff as part of its pleadings or the plaintiff has incorporated the video by reference after the defendant introduced the video.")

11

Further, Defendants flout the rules by providing the Court with the video of the events, but not the wealth of other relevant evidence upon which Plaintiffs will rely to prove their case. *See Estate of Holmes*, 387 F. Supp. 3d at 1243-44 (declining to consider video attached to a defendant's motion to dismiss because "certain events and statements included therein may be susceptible to more than one interpretation" and "evaluation of the videos in th[e] case w[ould] be aided by testimony and possibly other forms of evidence"). Provided with one single piece of evidence, this Court is unable to fairly assess the truth or falsity of vast categories of critical evidence, including (but certainly not limited to) testimony regarding the substance the multiple conversations between Ms. Sanchez and the various Defendants that are referenced in the Complaint (since the video is silent); off-camera communications among members of Denver sheriffs regarding Ms. Sanchez; off-camera communications among Denver Health nurses; off-camera communications between Denver sheriffs and Denver Health nurses; observations of Denver Health nurses reflected in their medical records (and to be expanded upon in their anticipated testimony); observations of Denver sheriffs as reflected in the written reports (and to be expanded upon in their anticipated testimony), to name just a few. *See Liebler v. City of Hoboken*, 2016 U.S. Dist. LEXIS 95641, at *2-3 (D.N.J. July 21, 2016) (declining to consider a video at the motion to dismiss stage and holding that "[t]he context of the statements [made in the video], the identities and tone of voice of the speakers, the decisions that may have preceded or surrounded the [incident], and so on, all present issues of factual interpretation" and therefore, "the video [wa]s not the sort of uncontroversial document that may itself settle the claims one way or the other [and] consideration of th[e] video in isolation from its evidentiary context has the capacity to distort the analysis").

Finally, Defendants, outside of citations to cases that outline the general standard for determining when a court may consider evidence outside of the complaint, only cite to manifestly distinguishable cases. [Doc. #22], p.3; *see Estate of Ronquillo v. City & Cty. of Denver*, 720 F. App'x 434, 437 (10th Cir. 2017) (video attached *by plaintiff* as an exhibit to complaint); *Jackson v. Gatto*, No. 13-cv-02516-CBS, 2014 U.S. Dist. LEXIS 82263, at *9 (D. Colo. June 17, 2014) (reviewing video at *both parties'* request); *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) (summary judgment); *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (summary judgment).[2] Those circumstances are clearly distinguishable here, where Plaintiffs did not attach the video to their Complaint, or otherwise incorporated it by reference, and now explicitly object to this Court considering the videos at this stage of the litigation.

Defendants' improper effort, in the context of a motion to dismiss, to rely on just *some* of the evidence outside of the Complaint must be rejected by this court.

## IV.  ARGUMENT

Plaintiffs' detailed 220-paragraph Complaint adequately alleges that all Defendants are liable for violating Plaintiffs' constitutional rights.

### A.  The Objective Standard of the Fourteenth Amendment Applies To Ms. Sanchez's and her Baby's Claims Against Denver and Denver Health

#### 1.  Ms. Sanchez and Her Baby Were Pretrial Detainees

Plaintiffs' Complaint alleges that Ms. Sanchez is a pretrial detainee (and Baby J.S.M. had obviously not been tried) and, given that this Court must take these well-pled allegations as true, this Court must analyze Plaintiffs' claims under the Fourteenth Amendment. [Doc. #1], ¶¶159-162.

---

[2] *Jackson v. Alexander*, 465 F.2d 1389, 1390 (10th Cir. 1972), is likewise irrelevant as it did not involve a video, but rather involved a dispute over a financial document, the typical situation where a court would view evidence extrinsic to a complaint on a motion to dismiss).

Ms. Sanchez was in Denver's custody awaiting hearing after having been arrested on an alleged probation violation. Critically, she had not yet had a probation revocation hearing (which was continued until August 2, 2018 because Ms. Sanchez was released after giving birth in her jail cell). *See* **Exhibit 1**. A pretrial detainee who has been detained on a probation revocation, but has not been adjudicated as having violated her probation, is protected by the Fourteenth Amendment; she has not yet had judgment entered against her and has not yet had a sentenced imposed on her. *See, e.g., Montoya v. Newman*, 115 F. Supp. 3d 1263, 1267 (D. Colo. 2015) (applying Fourteenth Amendment to claims brought by a pretrial detainee being held in county jail after violating terms of probation); *Ressy v. King Cty.*, 520 F. App'x 554 (9th Cir. 2013) (deeming claims of a detainee being held in "pre-hearing detention for a probation violation" as those of a pretrial detainee and assessing claims under Fourteenth Amendment); *Cox v. Booking Staff*, No. 1:17-cv-00520-JR, 2018 U.S. Dist. LEXIS 117085, at *3 (D. Or. May 21, 2018) (same); *Carpenter v. Klamath Cty. Jail*, No. 1:17-cv-00085-AA, 2018 U.S. Dist. LEXIS 43499, at *3 (D. Or. Mar. 13, 2018) (same); *Weishaar v. Cnty. of Napa*, No. 14-cv-01352-LB, 2016 U.S. Dist. LEXIS 173833, at *14-16 (N.D. Cal. Dec. 15, 2016) (applying Fourteenth Amendment to claims brought by an arrested probation violator); *Palmer v. Marion County*, 327 F.3d 588, 592-93 (7th Cir. 2003) ("The confusion about the constitutional predicate for Palmer's claims arises from the uncertainty as to whether a detainee awaiting a hearing on a probation violation can be "punished" under the Eighth Amendment."). Ms. Sanchez's claims (and those of her baby) arise under the Fourteenth Amendment, not the Eighth Amendment, and, therefore, the objective deliberate indifference standard applies to their claims.

### 2. *Because the Fourteenth Amendment Protected Ms. Sanchez and Baby J.S.M., An Objective Deliberate Indifference Standard Applies To Their Claims*

The Supreme Court has made clear that detainees have a constitutional right to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). Under the Fourteenth Amendment, a constitutional claim for inadequate medical care requires that a detainee show that defendants responded with deliberate indifference to her serious medical needs. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Prior to *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015), the Tenth Circuit held that "pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates" under the Eighth Amendment. *Garcia v. Salt Lake Cnty*, 768 F.2d 303, 307 (10th Cir. 1985). The Tenth Circuit has yet to decide whether, post-*Kingsley*, an objective deliberate indifference standard controls pretrial detainees' claims for medical deliberate indifference. *See Estate of Vallina v. Cty. of Teller Sheriff's Office & Its Det. Facility*, 757 F. App'x 643, 646-47 (10th Cir. 2018); *Perry v. Durborow*, 892 F.3d 1116, 1122 n.1 (10th Cir. 2018).

Post-*Kingsley*, the Tenth Circuit's holding in *Garcia*, and the application of the same deliberate indifference standard to both pretrial and convicted detainees, is in serious doubt. The District of Colorado, and one other district court in this Circuit, have held that the subjective deliberate indifference standard previously applied in conditions of confinement cases by pretrial detainees was abrogated by *Kingsley*. *See Eaves v. El Paso Cnty. Bd. Of Cnty. Comm'rs*, No. 16-cv-01065, 2017 U.S. Dist. LEXIS 43307, at *16-17 (D. Colo. March 24, 2017); *Abila v. Funk*, 220 F. Supp. 3d 1121 (D. N.M. 2016). Three other Circuits have held that *Kingsley* abrogates the subjective deliberate indifference standard in medical care cases. *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122-25 (9th Cir. 2018); *Darnell v. Pineiro*, 849 F.3d 17, 34-35 (2d Cir. 2017); *Bruno v. City of Schenectady*, 727 Fed. Appx. 717, 2018 WL 1357377, at *2-*3 (2d Cir. 2018) (unpublished); *cf. Richmond v.*

*Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018); *Love v. Franklin Cty.*, 376 F. Supp. 3d 740, 744-46 (E.D. Ky. 2019). Other courts agree that *Kingsley* mandates reconsideration of the mental state required in other kinds of Fourteenth Amendment cases brought by pretrial detainees. *See Darnell*, 849 F.3d at 34-35; *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc); *Abila*, 220 F. Supp. 3d at 1181.

This Court should follow *Kingsley*'s clear guidance and apply an objective deliberate indifference standard to Plaintiffs' claims.[3]

## B. Denver Sheriffs and Denver Health Nurses Violated Ms. Sanchez's and Baby J.S.M.'s Fourteenth Amendment Rights

Under the objective deliberate indifference test, Ms. Sanchez and Baby J.S.M. must only demonstrate that: "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries" *Gordon*, 888 F.3d at 1125; *see also Miranda*, 900 F.3d at 354. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn[ ] on the facts and circumstances of each particular case." *Id.*

As alleged in the Complaint, the facts of this case "easily fit the mold of *Gordon*, *Darnell*, and *Castro*." *Miranda*, 900 F.3d at 354. Denver sheriffs and Denver Health nurses "made the decision to continue observing [Ms. Sanchez] in the jail, rather than transporting her

---

[3] However, under either standard, Defendants violated Ms. Sanchez's and Baby J.S.M.'s Fourteenth Amendment rights.

to the hospital, with purposeful, knowing, or reckless disregard of the consequences." *Id.* Here, there is evidence that Denver sheriffs and Denver Health nurses "deliberately chose a 'wait and see' monitoring plan" for over five hours knowing that Ms. Sanchez was in labor and could deliver her child at any moment. *Id.* (citing *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 380-82 (7th Cir. 2017) (recognizing inaction as a deliberate choice in an inadequate medical care case)). Not only had Ms. Sanchez repeatedly informed sergeants, deputies, and nurses that she was experiencing contractions, leaking amniotic fluid, and bleeding vaginally – all for hours before she gave birth alone in her dirty cell – they observed these conditions and multiple nurses confirmed that she was in active labor hours before she gave birth in her cell. Yet, out of sheer indifference, Denver sheriffs and Denver Health nurses delayed sending Ms. Sanchez for further medical care until it was too late. Their treatment of Ms. Sanchez and her baby was shocking and appalling.

Defendants actions and inactions caused Ms. Sanchez to suffer significant emotional distress and physical pain, and both she and her baby suffered extreme risk and humiliation, among other damages. Had Defendants transported Ms. Sanchez to the hospital, she could have received an epidural (and other pain management), which would have certainly decreased her pain and suffering through the delivery. Ms. Sanchez was deprived of this fundamental choice. Delivering a child in a jail cell, with no medical supervision, is not only dangerous, it is terrifying. It is also demeaning and inhumane, as non-medical personnel saw Ms. Sanchez's most private body parts, and her baby is forever branded as having been born in a jail cell. Ms. Sanchez's son was forced to endure birth without proper medical care, or even instruments. The actions (and inaction) of Denver sheriffs and Denver Health nurses easily meet the objective

deliberate indifference standard. What should have been the happiest day of a new mother's life, was anything but for Ms. Sanchez.

**C. Even Under The Eighth Amendment Subjective Deliberate Indifference Standard, Ms. Sanchez and Baby J.S.M. Have Strong Claims Against Defendants**

The Supreme Court first recognized claims for deliberate indifference to a prisoner's medical needs in *Estelle v. Gamble,* 429 U.S. 97 (1976) and further clarified the applicable standards in *Farmer v. Brennan*, 511 U.S. 825 (1994). The *Estelle* Court held that such deliberate indifference constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Estelle*, 429 U.S. at 104. Deliberate indifference involves both an objective and a subjective component. The facts of this case easily satisfy both elements.

*1. Objective Component* [4]

The objective component is met if the deprivation is sufficiently serious. *Id.* A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). Moreover, a delay in medical care constitutes a constitutional violation where the plaintiff can show that the delay resulted in substantial harm. *Id*.

Ms. Sanchez's high-risk pregnancy, labor, and birth constitute obvious, serious medical needs. As the Sixth Circuit has succinctly explained:

> The virtually inevitable result of pregnancy and labor is the birth of a child. The birth of a child always presents a risk of serious injury to both mother and child. Adequate medical care means the appropriate standard of care under the circumstances. In this context, the appropriate standard of care would include birth in a place equipped with the personnel and resources to handle pregnancy-related emergencies. . . The [] Jail clearly was not so equipped, as the facts of this

---

[4] Defendants concede that Plaintiffs satisfy the objective component. *See* [Doc. #22], p.13; [Doc. #24], p.5.

case make painfully clear. The objective component of deliberate indifference is satisfied.

*Havard v. Wayne Cty.*, 436 F. App'x 451, 454-55 (6th Cir. 2011); *see also Pool v. Sebastian County, Ark.*, 418 F.3d 934, 945 (8th Cir. 2005) (pregnant inmate who was bleeding vaginally was suffering from a serious medical need); *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (serious medical need existed where five-months-pregnant inmate suffered amniotic leakage); *Moulton v. DeSue*, 966 F. Supp. 2d 1298 (M.D. Fla. 2012) (pregnant jail inmate complaining of stomach cramps constituted a serious medical need); *Jones v. Minn. Dept. of Corr.*, 512 F.3d 478, 482 (8th Cir. 2008) (holding that it would be obvious to a layperson that a pregnant inmate who is bleeding vaginally has an objectively serious medical need); *cf. Bingham v. Webster Cty.*, No. 1:05CV220, 2007 WL 2903996, at *8 (N.D. Miss. 2007) (denying summary judgment to jail employees and stating that "Court assumes that the repeated complaints of a pregnant woman who is bleeding vaginally is sufficiently serious as to meet [the *Estelle*] standard"). Simply put, "pregnancy labor is a sufficiently serious condition requiring medical care." *Clifton v. Eubank*, No. 00-cv-02555-JLK, 2006 U.S. Dist. LEXIS 91043, at *10 (D. Colo. Dec. 18, 2006) (also stating that "any lay person would recognize the obvious need a woman in labor has for a doctor's attention.").

## 2. *Subjective Component*

Denver sheriffs and Denver Health nurses were subjectively deliberately indifferent to Ms. Sanchez's and Baby J.S.M.'s obvious, serious medical needs. Under the second prong of the *Farmer* test, an "Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Gonzales v. Martinez*, 403 F.3d 1179, 1182-83 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 837). "Whether a prison

official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 827.

Courts have repeatedly held that failure to obtain – or undue delays in obtaining – adequate medical care for an inmate exhibiting the same symptoms as Ms. Sanchez (bleeding, cramping, amniotic leakage, pain, vaginal discharge) constitutes deliberate indifference in violation of the Eighth Amendment. *Coleman v. Rahija*, 114 F.3d 778, 784-86 (8th Cir. 1997) (finding nurse had subjective knowledge of serious medical need, in part, based on the nurse's notation that in the medical records that the plaintiff might have been in possible early labor and the plaintiff's objective symptoms that she was experiencing pre-term labor); *Doe v. Gustavus*, 294 F. Supp. 2d 1003, 1010 (E.D. Wis. 2003) (holding that a jury could find that defendants were aware that plaintiff was in pain and might be going into labor, and that in failing to assist her they knowingly subjected her to a substantial risk of harm); *Webb v. Jessamine Cty. Fiscal Court,* 802 F. Supp. 2d 870, 880 (E.D. Ky. 2011).

Defendants – despite knowing that Ms. Sanchez was nearly nine months pregnant, was bleeding vaginally, was complaining of labor pains, had a broken amniotic sac, was having contractions, had a high-risk pregnancy, and that the Denver County Jail was wholly unequipped to handle the delivery of a baby – did nothing to ensure that she was transported to a hospital. *Havard*, 436 F. App'x at 455 (holding that knowledge that a woman was "at least seven months pregnant, …was complaining of labor pains, …was dilated at 2 centimeters, …was having contraction, and specifically told [d]efendants that the baby was 'coming out,' and that the [] Jail was wholly unequipped to handle the delivery of a baby," and a conscious decision not to

transport said woman to the hospital, constituted deliberate indifference to both her, and her baby's, serious medical needs in violation of the Eighth Amendment).[5]

Finally, "[h]igh-risk pregnancies by their very nature pose a high risk of danger that something goes wrong with the pregnancy." *Tanner v. McMurray*, No. CIV 17-0876 JB\KBM, 2018 U.S. Dist. LEXIS 196477, at *182 (D.N.M. Nov. 19, 2018). Given Denver sheriffs' and Denver Health nurses' knowledge that Ms. Sanchez had a high-risk pregnancy, their reaction to her obvious labor symptoms was particularly deliberately indifferent. *See Coleman*, 114 F.3d at 784-86. There is no doubt Defendants' violation of Plaintiffs' constitutional rights is adequately pled.

### D. Denver and Denver Sheriffs Cannot Avoid Liability by Passing Blame to the Denver Health Nurses

Denver (and its sergeants and deputies) cannot avoid liability by passing blame to the nurses. First, that Denver Health medical personnel were *also* deliberately indifferent to Ms. Sanchez's and Baby J.S.M.'s constitutional rights does not shield Denver from liability. *See Weatherford ex rel. Thompson v. Taylor*, 347 F. App'x 400, 403 (10th Cir. 2009) (unpublished) ("[A] prison official may rely on a medical professional's opinion *if such reliance is reasonable*.") (quotation omitted, emphasis added). Even more fundamentally, "the State cannot, by choosing to delegate its constitutional duties to the professional judgment of others, thereby avoid all liability flowing from the attempted fulfillment of those duties under Section 1983." *Anglin v. City of Aspen, Colo.*, 552 F.Supp.2d 1229, 1244 (D. Colo. 2008); *see also Napier v.*

---

[5] Notably, court across the country have consistently held that *jail staff* who ignored obvious signs of imminent childbirth met this subjective standard.  The Denver Health Defendants' assertions that Denver Health *nurses* were somehow unaware of the risks associated with the birth of a baby after high-risk pregnancy with no medical care or other assistance, in a dirty jail cell, requires to court to conclude that these nurses not only lack any medical training, but also common sense.

*Lesnansky*, No. 14-CV-02816-RBJ, 2016 WL 5791214, at *5 (D. Colo. Aug. 17, 2016);

*Stojcevski v. Cty. of Macomb*, No. 15-11019, 2019 U.S. Dist. LEXIS 167691 at *39-43 (E.D.

Mich. Sep. 30, 2019). Here, the Denver Defendants recognized the substantial risk of harm to

Plaintiffs based on Ms. Sanchez obviously being in the throes of labor, as any layperson would.

Yet, they acted as gatekeepers who failed to provide Plaintiffs with access to care, in

contravention of reasonable judgment.

Moreover, "Defendants are liable for the harm proximately caused by their conduct. . . .

That conduct of other people may have concurrently caused the harm does not change [that]

outcome." *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012) (citations omitted).

Likewise, in this case, "even a lay person would easily [have] recognize[d] the necessity for a

doctor's attention." *Al-Turki v. Robinson*, 762 F.3d 1188, 1192-93 (10th Cir. 2014). Again, the

court in *Havard* articulates this point saliently:

> This case presents a situation where the medical need was blatantly obvious and
> the medical risks were great. It takes very little foresight to anticipate that a baby
> will appear soon after labor begins. Holding that Defendants were required to
> respond to that medical need does not impose a duty on them beyond what the law
> already clearly establishes: prison officials cannot deliberately ignore the obvious
> and serious medical needs of those within—or imminently to be within—their
> custody.

436 F. App'x at 456. Simply put, a prison official who "prevent[s] an inmate from receiving

medical treatment or den[ies] access to medical personnel capable of evaluating the inmate's

condition" is deliberately indifferent. *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006).

Denver sergeants and deputies, seeing that the Denver Health nurses were taking a callously lax

approach to providing Ms. Sanchez and Baby J.S.M. with the requisite medical care they

obviously needed, were constitutionally required to ensure that Ms. Sanchez was transported to a

hospital. All that would have required would have been a call to 911. They failed to do so and, in turn, violated Plaintiffs' constitutional rights.

One District of Colorado case, in particular, illustrates that Defendants are liable for violating Plaintiffs' constitutional rights. In *Clifton* (litigated by undersigned counsel), the plaintiff informed guards that she was in labor and needed medical assistance on two separate occasions, but was told to return to her cell both times. 2006 U.S. Dist. LEXIS 91043, at *1. Plaintiff was finally taken to see medical staff roughly seven hours later, but was told that it was a "false alarm" and sent back to her cell. *Id*. Plaintiff was later seen by the nurse who determined that the plaintiff's child had died. *Id.* Only at this point was an appointment made so that she could be transported to the hospital to deliver the stillborn baby. *Id.* The court held that the prison guards had actual knowledge of plaintiff's risk of harm because she had told them about her contractions. *Id*. at *4-5. The court also held that by failing to send her to a medical facility, the guards disregarded that risk where the guards knew she was pregnant. *Id.* The Court emphasized that:

> [w]hether or not Defendants' actions were the proximate cause of the stillbirth is not dispositive. The Tenth Circuit recognizes that officials' delay in providing medical care, which resulted in 'continued and unnecessary pain,' violated the deliberate indifference standard.

*Id*. at *5 (quoting *Ramos v. Lamm,* 639 F.2d 559, 576 (10th Cir. 1980)). The court also held that the nurse was deliberately indifferent to plaintiff's serious medical needs because the nurse delayed sending the inmate to the hospital (causing her a great deal of fear and physical suffering), despite noting that the inmate was in possible early labor after conducting an examination. *Id.* Importantly, the court held that, upon noting that the inmate was in possible early labor, it would have been obvious to any layperson the necessity of a doctor's attention

and, thus, both the nurse and prison guards should have sought further assistance for the inmate. *Id*. at *6.

The parallels between *Clifton* and this case are obvious. Ms. Sanchez alerted Defendants almost six hours before baby J.S.M.'s birth that she was experiencing contractions and vaginal bleeding. Despite this, a nurse did not examine Ms. Sanchez for another four hours. During that examination, the nurse saw that Ms. Sanchez's water had broken and that she continued to bleed vaginally. Even then, no Denver Health nurse nor Denver sheriff sent Ms. Sanchez to see a doctor or provided her further medical treatment. Instead, callously, Defendants decided to wait hours to transport Ms. Sanchez after booking, because a timelier transport of this woman in active labor to a hospital would have been inconvenient. This is textbook deliberate indifference.

### F.   Plaintiffs Have Adequately Alleged Each Defendant's Personal Participation In The Violation Of Plaintiffs' Constitutional Rights

"For liability under section 1983, direct participation is not necessary," as "[a]ny official who 'causes' a citizen to be deprived of [his] constitutional rights can…be held liable." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1279 (10th Cir. 2008). "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of [her] constitutional rights." *Id*. at 1279-80. Every named Defendant is liable for her/his violation of Plaintiffs' constitutional rights.[6]

#### 1.   *Defendant Albee Is Liable For His Violation Of Plaintiffs' Rights*

As alleged in the Complaint, Defendant Albee: (1) knew that Ms. Sanchez was suffering from objectively serious symptoms related to her pregnancy and labor that even a layperson

---

[6] Plaintiffs have adequately pled the facts supporting the liability of each named Defendant. This Response only addresses the specific culpability of those Defendants highlighted in Defendants' briefing.

would know required immediate emergency medical attention (including knowing that Ms. Sanchez was in active labor, bleeding vaginally, and her water had broken) and, instead, (2) acknowledged his awareness that Ms. Sanchez needed immediate medical attention; (3) was aware that she was not being transported by ambulance; and (4) actively decided not to call for an emergent van run or ambulance, resulting in Ms. Sanchez giving birth in her jail cell. [Doc. #1], ¶¶32,39. Defendant Albee is therefore liable for violating Plaintiffs' constitutional rights.

### 2. Defendants Hart and Garcia Are Liable For Their Violation Of Plaintiffs' Rights

As alleged in the Complaint, Defendants Hart and Garcia knew, approximately an hour before Ms. Sanchez gave birth, that: (1) Ms. Sanchez had been reporting to jail and medical staff "constant" contractions that had begun around 5:00am, (2) Ms. Sanchez's water had clearly broken, and (3) Ms. Sanchez was bleeding vaginally. Defendants Hart knew this because Ms. Sanchez had told him this multiple times and Nurse Chacon had communicated this information to him; Defendant Hart communicated all of this information to his supervisor, Defendant Garcia. *Id.*, ¶¶32-39. Yet Defendants Hart and Garcia did not ensure that Ms. Sanchez was transported emergently to a hospital, and instead ordered a non-emergent van run (which they knew would likely not take place until two hours later). *Id.* Their direct knowledge of these obvious symptoms of a medical emergency (and the fact that any layperson would know that labor and delivery *require* immediate hospitalization), and their abject failure to take any action whatsoever to ensure Ms. Sanchez was timely provided with the necessary medical care, demonstrate their deliberate indifference to Ms. Sanchez's and Baby J.S.M.'s obvious, serious medical needs.

### 3. Defendant Wherry Is Liable For Her Violation Of Plaintiffs' Rights

As alleged in the Complaint, Defendant Wherry was specifically informed by Ms. Sanchez over an hour before she gave birth that: (1) her water had broken, and (2) she was experiencing abdominal pain. *Id.*, ¶27. Despite witnessing Ms. Sanchez's clear distress, and in the midst of labor and imminent childbirth, Defendant Wherry did nothing to ensure that Ms. Sanchez was immediately transported to the hospital. Instead, she took a meal break. *Id.*, ¶¶30-31. After Defendant Wherry returned from her break, approximately forty-five minutes later, she immediately saw that Ms. Sanchez was still in her cell and that no emergency transportation had been ordered. *Id.*, ¶41. She also observed that the absorbent pad that Ms. Sanchez had been given earlier was soaked and that Ms. Sanchez was clearly in excruciating pain. *Id.*, ¶42. Still, Defendant Wherry did not call for an ambulance. *Id.*, ¶44. Defendant Wherry was simply an observer and did nothing to ensure Ms. Sanchez received the emergent care she knew Ms. Sanchez needed, despite knowing that Ms. Sanchez would give birth prior to the end of the booking process. In anticipation of having to help deliver Ms. Sanchez's child *in a jail cell*, she donned gloves and returned to her post just outside Ms. Sanchez's cell but still did not call 911. *Id.*, ¶45. While Defendant Wherry was the only Defendant that showed any humanity toward Ms. Sanchez, her conscious failure to ensure that Ms. Sanchez's obvious and serious medical needs received the *only* appropriate treatment in the situation – emergent transportation to a hospital – makes her liable for violating Ms. Sanchez's and Baby J.S.M.'s rights.

## G. Denver Sheriffs And Denver Health Nurses Violated Baby J.S.M.'s Constitutional Rights

Baby J.S.M. has viable claims for Defendants' violation of his Fourteenth Amendment rights separate and apart from Ms. Sanchez's claims. Any argument that Baby J.S.M. does not have cognizable rights for the lack of treatment he was provided (and for Denver and Denver Health officials' decision to force his mother to give birth in a jail cell) has been refuted by every

court to directly decide the issue. *See Havard*, 436 F. App'x at 456; *Mori v. Allegheny Cty.*, 51 F. Supp. 3d 558, 576 (W.D. Pa. 2014). And, contrary to Denver Defendant's assertions, Baby J.S.M. has two separate claims (as established by the above-cited cases, among others): (1) Defendants' violation of his right to care free of deliberate indifference to his obvious, serious medical needs, and (2) Defendants' failure to satisfy the duties imposed on them by the special relationship doctrine. These separate and distinct claims analyzed under different legal frameworks that lead to the same conclusion: Defendants violated Baby J.S.M.'s Fourteenth Amendment rights.

### 1. Defendants Violated Baby J.S.M.'S Right To Care Free Of Deliberate Indifference To His Obvious, Serious Medical Needs

The state assumed custody and control of Baby J.S.M. upon his birth in the Denver County Jail. Defendants therefore had an affirmative duty to care for him. This non-delegable duty includes an obligation to provide adequate medical care. *See Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005) (holding that states have "a constitutional duty to provide adequate medical care to incarcerated prisoners, those involuntarily committed to mental institutions, foster children, pre-trial detainees, and those under other similar restraint of personal liberty"); *see also Bell v. Wolfish*, 441 U.S. 520, 546 (1979) (Fourteenth Amendment gives non-convicted persons, such a pre-trial detainees, the right to adequate medical care while in state custody).

Baby J.S.M. certainly has claims for the lack of appropriate medical care provided once he was born. *Mori*, 51 F. Supp. 3d at 576 ("[T]he injuries to mother and child from defendants' course of deliberate indifference were ongoing and resulted in injuries to the child during and after the birthing process, a point in time when the child clearly was a person within the meaning of the Fourteenth Amendment."); *see also Havard*, 436 F. App'x at 456 ("Defendants also argue that any constitutional duty to Chelsie did not arise until she was actually born… and that no

clearly established law imposed upon them a duty to anticipate her needs before that moment. Although this argument has some logical appeal, it is simply unreasonable in the context of this case. This case presents a situation where the medical need was blatantly obvious, and the medical risks were great. It takes very little foresight to anticipate that a baby will appear soon after labor begins. Holding that Defendants were required to respond to that medical need does not impose a duty on them beyond what the law already clearly establishes: prison officials cannot deliberately ignore the obvious and serious medical needs of those within – or imminently to be within – their custody." (citations and quotations omitted)).

And, the care that Baby J.S.M. received once born was clearly deliberately indifferent. Despite it being obvious to every medical professional (and layperson) that newborn babies require special care from a qualified OBGYN, none of that care was provided to Baby J.S.M. For approximately two minutes after the birth, no nurse dried or warmed Baby J.S.M. For several minutes (or more), no nurse at Denver County Jail took the obvious and necessary medical actions of clearing the mucus from Baby J.S.M.'s nose and mouth, applying antibiotic or antiseptic eyedrops to prevent eye infection, providing a vitamin K injection after the birth, providing Baby J.S.M. with a cap to warm his head, providing a hepatitis B virus vaccine, providing necessary care to address risk factors to Baby J.S.M. associated with Ms. Sanchez's use of prescribed methadone, or other high-risk prenatal issues, weighing or otherwise measuring Baby J.S.M, or providing Baby J.S.M. with an identifying medical bracelet. Denver's and Denver Health's failure to provide Baby J.S.M. with even the most basic post-delivery care was not just negligent, it was deliberately indifferent to his obvious, serious medical needs. [Doc. #1], ¶¶59-69.

Finally, the same deliberately indifferent actions (and inaction) by Defendants that underlie Ms. Sanchez's constitutional claims also underlie Baby J.S.M.'s constitutional claims. Had Defendants taken Ms. Sanchez to the hospital, Baby J.S.M. would not have had to endure being born in a jail cell, or the lifetime of humiliation associated with that. And, for the same reasons outlined previously, the deputies and sergeants cannot escape liability for their actions by blaming the nurses because they also ignored the serious medical needs of Baby J.S.M. and his mother.

### 2. Defendants Violated The Duties To J.S.M. Imposed On Them By The Fourteenth Amendment's Special Relationship Doctrine

"The special relationship doctrine applies when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual." *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012) (citation and internal quotation marks omitted); *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 199-200 (1989). Where an agency has a special relationship with a child, its employees also have a special relationship. *Johnson v. Holmes*, 455 F.3d 1133, 1135 (10th Cir. 2006).

"The special relationship triggers a continuing duty which is subsequently violated if a state official 'knew of the asserted danger to [a child] or failed to exercise professional judgment with respect thereto, . . . and if an affirmative link to the injuries [the child] suffered can be shown.'" *Schwartz*, 702 F.3d at 581 (quoting *Yvonne L. v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 890 (10th Cir. 1992)). Failure to exercise professional judgment occurs when, through action or inaction, an official "substantial[ly] depart[s] from accepted professional judgment, practice or standards." *Johnson*, 455 F.3d at 1144 (citation omitted). Failure of professional judgment "does not require actual knowledge the children will be harmed," *Yvonne L.*, 959 F.2d at 894, but to trigger liability, the failure must be sufficient to shock the conscience. *Johnson*,

455 F.3d at 1143. Defendants' departure from accepted professional judgment is clearly pled here. And, forcing a child to be born in a jail cell certainly shocks the conscience and establishes that Baby J.S.M. has a clear claim for violation of his Fourteenth Amendment rights.

## H.  No Defendant Is Entitled To Qualified Immunity

### 1.  Denver Health Defendants Cannot Claim The Defense Of Qualified Immunity

When a person acts "under color" of law, whether that person is a private or public individual, she is liable under §1983 if her actions subject, or cause to be subjected, another individual to a deprivation of constitutional rights. *See Richardson v. McKnight*, 521 U.S. 399, 403 (1997). Private actors are not automatically entitled to assert qualified immunity. *Id.*, at 412. Denver Health's employees are private actors because Denver Health is "a body corporate and… not [] an agency of the state or local government… [and] not [] subject to administrative direction or control by any department, commission, board, bureau, or agency of state or local government." Colo. Rev. Stat. § 25-29-103. In *Richardson*, the Court held private prison guards at a state prison could *not* claim qualified immunity. 521 U.S. at 404-412. Denver Health is a private medical care corporation, with no government direction or supervision and, therefore, its employees are not entitled to qualified immunity. *Id.*

To determine whether a private actor is entitled to claim the defense of qualified immunity, this Court must examine whether: (1) there was a firmly rooted history of immunity for similarly situated parties at common law; and (2) the purposes behind the affording immunity to government employees warrant extending immunity to the private defendant. *Filarsky v. Delia*, 132 S. Ct. 1657, 1665 (2012). First, a private nurse working for a public institution at the time Congress passed § 1983 (the late 19th century) would not have been immune from a suit at common law. *McCullum v. Tepe*, 693 F.3d 696, 697-98 (6th Cir. 2012) (examining the history of

common law immunities at the time of Section 1983's passage). Second, nearly every case that

has decided the issue has determined that the purposes behind affording immunity to government

employees does not militate in favor of extending immunity to private healthcare employees who

operate in correctional settings. *Harrison v. Ash*, 539 F.3d 510, 524 (6th Cir. 2008); *see also*

*Currie v. Chhabra*, 728 F.3d 626, 631-33 (7th Cir. 2013); *Garner v. Mohave Cty.*, No. CV-15-

08147-PCT-PGR, 2016 U.S. Dist. LEXIS 21045, at *2-9 (D. Ariz. Feb. 22, 2016); *Thompson v.*

*Ackal*, No. 15-02288, 2016 U.S. Dist. LEXIS 47154, at *36-42 (W.D. Mar. 9, 2016); *Cady v.*

*Cumberland Cty. Jail*, No. 2:10-cv-00512-NT, 2013 U.S. Dist. LEXIS 109195, at *96-101 (D.

Me. Mar. 22, 2013); *Zikianda v. Cty. of Albany*, No. 1:12-CV-1194, 2015 U.S. Dist. LEXIS

122363, at *46-49 n.6 (N.D.N.Y. Sep. 15, 2015); *Hendricks v. Pickaway Corr. Inst.*, No. 2:08-

cv-00580, 2015 U.S. Dist. LEXIS 159261, at *8-11 (S.D. Ohio Nov. 25, 2015); *Cheek v. Nueces*

*Cty. Tex.*, No. 2:13-cv-26, 2013 U.S. Dist. LEXIS 110039, at *68-69 (S.D. Tex. Aug. 5, 2013).

Although the Tenth Circuit has not decided the issue, *Kellum v. Mares*, 657 F. App'x 763,

768 n.3 (10th Cir. 2016), numerous District Courts in this Circuit have held that private

healthcare providers in correctional facilities are not entitled to qualified immunity. *See Carmody*

*v. Ensminger*, No. 16-cv-02603-PAB-NYW, 2017 U.S. Dist. LEXIS 151905, at *9 (D. Colo.

Sep. 19, 2017) (holding that employees of a private healthcare company operating in a

correctional facility could not claim qualified immunity); *Estate of Grubbs v. Weld Cty. Sheriff's*

*Office*,  No. 16-cv-00714-PAB-STV, 2017 U.S. Dist. LEXIS 33009, at *19 (D. Colo. Mar. 8,

2017); *Schwark v. Wegener, et al.*, Case No. 1:15 -cv-02507-JLK (D. Colo. March 29, 2019)

(attached as **Exhibit 2**); *Estate of Stieb v. Johnson*, No. 16-cv-02548-KLM, 2018 WL 4111018,

*13 (D. Colo. Aug. 29, 2018); *Atchison v. Corr. Healthcare Cos.*, No. CV 15-00039 WJ/SCY,

2016 U.S. Dist. LEXIS 192051, at *18 (D.N.M. Mar. 8, 2016); *Kellum v. Bernalillo Cty.*, No.

1:14-cv-00163 RB/CG, 2015 U.S. Dist. LEXIS 192619, at *21 (D.N.M. Nov. 10, 2015).

Finally, "[t]he other circuits to have addressed this question have all found that qualified

immunity is unavailable to employees of a private company providing such medical services."

*Grubbs*, 2017 U.S. Dist. LEXIS 33009, at *17 (collecting cases). In accordance with the

resounding consensus of courts in this District and other Circuits, and consistent with

*Richardson*, this Court should not extend qualified immunity to the Denver Health Defendants.

### 2. *Plaintiffs' Rights Were Clearly Established*

"[T]here is little doubt that deliberate indifference to an inmate's serious medical need is

a clearly established constitutional right." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005); *see*

*also Estelle*, 429 U.S. at 103. Defendants were therefore on notice that their failure to provide

any meaningful care to Plaintiffs, despite obvious signs of serious medical needs, violated their

clearly established rights. Further, Defendants' failure to provide Plaintiffs with *access to* further

medical treatment, including physician and emergent medical care, implicates a clearly

established right to receive adequate "gatekeeping" treatment in order to obtain basic medical

care. *See Sealock*, 218 F.3d at 1211.

The Tenth Circuit has long held that when a plaintiff brings a cause of action alleging

deliberate indifference to a serious medical need, the above cases defeat a claim of qualified

immunity:

> [T]he "deliberate indifference" standard for claims of inadequate medical care . . .
> ha[s] been clearly established at least since *Estelle v. Gamble,* . . . decided in
> 1976. . . . Since we conclude that the allegations in [plaintiff]'s complaint are
> sufficient to state an Eighth Amendment claim against [defendants], we reverse
> the district court's finding that these defendants are entitled to qualified immunity.

*Kikumura v. Osagie*, 461 F.3d 1269, 1296-97 (10th Cir. 2006); *see also Al-Turki*, 762 F.3d at 1195 (rejecting claim of qualified immunity by a prison nurse who was alleged to be liable for deliberate indifference as a gatekeeper because she learned the plaintiff was in immense pain and did not see him or have him seen by other medical personnel, despite nurse's assertion that she should be immune from liability because the exact scenario presented in that case had not previously been the subject of a Tenth Circuit decision).

Further, a constitutional right can be clearly established "by the weight of authority from other courts." *Herring v. Keenan*, 218 F.3d 1171, 1176 (10th Cir. 2000) (citing *Anaya v. Crossroads Managed Care Systems, Inc.*, 195 F.3d 584, 594 (10th Cir. 1999)). Ms. Sanchez's right to give birth in a hospital setting was clearly established by the great weight of authority of other courts, and Defendants' conduct violated that clearly established right. *Clifton,* 2006 U.S. Dist. LEXIS 91043, at *10 (finding well over a decade ago that defendants had "fair warning" that their conduct constituted a violation of federal law because there were sufficient cases holding that an officer's delay in providing medical treatment to a pregnant inmate constitutes deliberate indifference to the inmate's medical needs, thus violating Eighth Amendment rights); *see also Havard*, 436 F. App'x at 455 (Sixth Circuit holding in 2011 that defendants' conduct met the subjective deliberate standard where they failed to take inmate to hospital despite knowledge that she was pregnant, complaining of labor pains, dilated, having contractions, and were told that the baby was "coming out," and that the jail was wholly unequipped to handle the delivery of a baby); *Goebert* (holding that failure to respond to pregnant pretrial detainee's complaint about lack of treatment for persistent leaking of amniotic fluid violated well established right of prisoners to timely treatment for serious medical conditions); *Boswell v. Sherburne County*, 849 F.2d 1117 (8th Cir. 1988) (finding that defendants violated pretrial

detainee's clearly established right to emergency medical care where she was six months pregnant and started bleeding, cramping and crying, and was starting to go into labor); *Moulton*, 966 F. Supp. 2d at 1309-10 (holding that correctional officers were on notice that their alleged actions or inactions violated jail inmate's clearly established right to adequate medical care, where pregnant inmate complained of stomach cramps all night, and she and other inmates consistently used intercom system to summon help); *Archer v. Dutcher*, 733 F.2d 14 (2nd Cir. 1984) (holding that a pregnant inmate who miscarried stated a cognizable claim where she alleged that defendant prison officials intentionally delayed emergency medical aid); *Webb*, 802 F. Supp. 2d at 881-82 (holding that right to be free from cruel and unusual punishment by virtue of deliberate indifference to a serious medical need was clearly established in claim arising from inmate giving birth to child in cell). It is clear, based on this weight of authority, that the sergeants, deputies, and nurses were deliberately indifferent to Ms. Sanchez's and her baby's serious medical needs, and that the law was clearly established. *See also Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 530 n.5 (8th Cir. 2009) (en banc) ("That labor is inherently risky is well known . . . and the hazards associated with labor and childbirth have entered the collective consciousness.").

The Tenth Circuit has stressed that courts "cannot find qualified immunity wherever [they have] a new fact pattern." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). Instead, "[e]ven when no precedent involves facts materially similar to [the one at issue], the right can be clearly established if a precedent applies with obvious clarity. When the public official's conduct is egregious, even a general precedent would apply with obvious clarity." *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017) (citation omitted). As this Court and the Supreme Court have noted, such an approach is necessary to avoid the

"remarkable" situation of "the most obviously unconstitutional conduct [being] the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." *Lowe*, 864 F.3d at 1211; *see also see also United States v. Lanier*, 520 U.S. 259, 271 (1997) ("There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability." (internal quotation marks omitted)).

Here, even were it not for the weight of authority (including *Clifton*, 2006 U.S. Dist. LEXIS 91043, at *10 (denying qualified immunity and holding that the law was clearly established as of December 25, 1998 that an inmate in labor required the attention of a doctor)), Defendants' treatment of Ms. Sanchez and Baby J.S.M. was so egregious and obviously unconstitutional that a person of ordinary common sense, to say nothing of those trained on the contours of the constitution, would know without need for specific instruction from a federal court that forcing a woman to give birth, alone, on a cold, hard bench in a jail cell violates the constitution. Existing precedent, common sense, and basic respect for another's human being's personal dignity "place[s] the conclusion that [Defendants] acted unreasonably in these circumstances 'beyond debate.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v al-Kidd*, 563 U.S. 731, 741 (2011)); *see also Sepulveda v. Ramirez*, 967 F.2d 1413, 1416 (9th Cir. 1992) ("[Defendants'] behavior as alleged runs contrary to common sense, decency, and [law].").

I. **Denver[7] And Denver Health Are Municipally Liable For Their Violations Of Plaintiffs' Constitutional Rights**

---

[7] Denver only addresses whether Plaintiffs state a claim based on the ratification theory of municipal liability. However, as outlined herein, Plaintiffs do not assert liability on the basis of ratification alone. The well-pled complaint alleges that Defendants violated Plaintiffs' constitutional rights pursuant to Denver's (and Denver Health's) custom, policy, and practice and in accordance with Denver's (and Denver Health's) lack of training and supervision.

A municipality is liable for constitutional torts if the alleged unconstitutional acts implicate a policy, ordinance, or custom of the local government, and the execution of a policy or custom actually caused an injury of constitutional dimensions. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94 (1978). Plaintiffs must establish "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Commr's*, 151 F.3d 1313, 1316 (10th Cir. 1998). A policy or custom can be established in many ways, including demonstrating the existence of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation and quotations omitted).

### 1.   *Plaintiffs Can Prove Municipal Liability Through Denver's And Denver Health's Multiple Informal, Unconstitutional Customs Amounting To A Widespread Practice*

Establishing an informal policy or custom requires the plaintiff to show that the misconduct was "widespread" - *i.e.*, that it involved a "series of decisions." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *see also Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). At the motion to dismiss stage, plaintiffs must only allege:

> (1) The existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the . . . [municipality's] employees; (2) Deliberate indifference to or tacit approval [of] such misconduct by the . . [municipality's] policymaking officials . . . after notice to the officials of that particular misconduct; and (3) That the plaintiff was injured by virtue of the unconstitutional acts pursuant to the . . . [municipality's] custom and that the custom was the moving force behind the unconstitutional acts.

*Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir.1993).

### 2.  Plaintiffs Can Prove Municipal Liability Through Denver's And Denver Health's Continuing, Persistent And Widespread Practice Of Unconstitutional Misconduct

Plaintiffs can successfully plead the existence of a continuing, persistent and widespread

practice of unconstitutional conduct through allegations demonstrating:

> past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy.

*Arakji v. Hess*, No. 15-cv-00681-CMA, 2015 U.S. Dist. LEXIS 161600, at *16-17 (D. Colo.

Dec. 2, 2015)(quoting *Taylor*, 2011 U.S. Dist. LEXIS 97985, at *3).

### 3.  Plaintiffs Adequately Allege That Denver And Denver Health Have Multiple Informal, Unconstitutional Customs Amounting To A Widespread Practice <u>AND</u> Continuing, Persistent And Widespread Practices Of Unconstitutional Misconduct

First, a plaintiff adequately alleges a continuing, persistent and widespread practice when

he alleges previous similar incidents of misconduct by a municipality's officials, though "no set

number" of incidents is required. *Arakji, supra*, at *18. Multiple courts, including the District of

Colorado, have held that three or more examples are sufficient to establish a custom at the

motion to dismiss stage. *See Estate of Valverde v. Dodge*, 2017 U.S. Dist. LEXIS 131402, at *13

(D. Colo. Aug. 17, 2017)(relying on examples that involved "different individuals and span[ed] a

significant time period" in holding that plaintiff had pled a widespread custom); *Sekerak v. City*

*& Cnty. of Denver*, 1 F.Supp.2d 1191, 1199 (D. Colo. 1998); **Ex. 3**, *Cardenas-Villescas v.*

*Greeley*; **Ex. 4**, *Castille v. Denver,* pp. 12-14 (one other incident, combined with other

allegations, was sufficient to allege *Monell* liability).

Plaintiffs easily meet this bar. The Complaint lists six separate examples that are

emblematic of Denver's and Denver Health's unconstitutional customs, policies, and practices of

deliberate indifference to inmates' obvious, serious medical needs. [Doc. #1], ¶¶101-105,113-

117. The other cases alleged in the Complaint provide only representative examples of the rampant deliberate indifference to serious medical needs by Denver and Denver Health, and the lack of adequate training or supervision on the part of the Denver and Denver Health to prevent these dangerous and unlawful patterns of conduct.

Second, Plaintiffs allege that they were subjected to "multiple harms" by the individual Defendants' deliberately indifferent medical care, that the deliberately indifferent medical care "occurred in the open," and that "multiple officials" were involved "in the misconduct." *Arakji, supra,* at *16-17. Half of a dozen officials openly ignored Plaintiffs, who were clearly in dire need of medical care. [Doc. #1], ¶¶18-80.

Third, Plaintiffs allege "the specific topic of the challenged policy or training inadequacy." *Arakji, supra,* at *16-17. Multiple courts have held that a plaintiff need only plead that the unconstitutional policy (unwritten or written) exists and that it caused the alleged constitutional violation,[8] reasoning that the usual rule of pleading – that courts are to accept all allegations as true at the motion to dismiss stage – applies in the context of pleading a *Monell* policy, practice, or custom claim. See *Walker, supra,* at *14.[9] Plaintiffs adequately allege that the

---

[8] "It is not reasonable to expect a plaintiff to have information about other incidents at the pleading stage; instead, a plaintiff should be given the opportunity to develop an evidentiary record to determine whether he can provide support for his claims." *McCormick v. City of Chicago,* 230 F.3d 319, 325 (7th Cir. 2000); *Sledd v. Linsday,* 102 F.3d 282, 288-289 (7th Cir. 1996); *Williams v. City of New York,* 690 F. Supp. 2d 338, 344 (S.D.N.Y. 2010)(finding it unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage); *Mitchell v. Township of Pemberton,* 2010 U.S. Dist. LEXIS 60038, at *6 (D.N.J. June 17, 2010)("[I]nformation concerning a town's customs or policies, the policymakers' motivations behind such policies, or the facts surrounding police department customs, are typically unavailable to an outsider, so that pleading…may be impossible without some assistance through litigation tools such as request for admissions, interrogatories, document requests, and depositions.").

[9] *See also Taylor,* 2011 U.S. Dist. LEXIS 97985, at *4 ("While it is true that plaintiffs do not include in their complaint additional instances of [similar conduct], that omission is not fatal under *Iqbal* because it is unlikely that plaintiffs would have access to such information at the

individual Defendants' constitutionally inadequate treatment was pursuant to Denver's and Denver Health's customs, policies and/or practices, including: Taking a "wait and see" approach to providing medical care to inmates suffering from obvious, serious medical needs that require immediate attention; Failing to provide care based on automatic assumptions that inmates are lying about, faking, or exaggerating their symptoms; Failing to provide care due to prioritizing convenience over necessary medical treatment; Failing to discipline officers and jail medical personnel, or even find the officers and jail medical personnel engaged in wrongdoing, in the face of obvious constitutional violations (thereby ensuring that officers and medical personnel would repeatedly, and customarily, violate the constitutional rights of inmates); Failing to adequately train their officers and jail medical providers; and Failing to adequately staff detention facilities. [Doc. #1], ¶¶86-90. Like the informal customs and practices the Tenth Circuit found adequately alleged in *Martinez v. Winner,* 771 F.2d 424, 434-44 (10th Cir. 1985), Plaintiffs set forth specific, concrete customs that led to Denver's and Denver Health's violation of their constitutional rights.

Fourth, courts have routinely held that a widespread custom or practice may be inferred *solely* from the conduct of a municipality after an incident when no steps are taken to reprimand or otherwise taken in response to plainly unconstitutional conduct. *See Cordova v. Aragon*, 569

---

pleading stage"); *Gooding v. Ketcher*, 838 F. Supp. 2d 1231, 1240-41 (N.D. Okla. 2012) (properly pleading *Monell* liability "required more than 'boilerplate allegations' of a municipal policy, but did not 'deman[d] specific facts that prove the existence of a policy' when a plaintiff would not have access to such information before discovery"); *Wilson v. City of Chi.*, No. 09 C 2477, 2009 U.S. Dist. LEXIS 93912, at *8 (N.D. Ill. Oct. 7, 2009); *Bartholomew v. Fischl*, 782 F.2d 1148, 1152-53 (3d Cir. 1986)(plaintiff who pleaded "'a single instance of illegality'" had sufficiently "pleaded the existence of an official policy or official conduct sufficient to support municipal liability").

F.3d 1183, 1194 (10th Cir. 2009)[10]; *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986)

(holding that "[p]olicy or custom may be inferred" if officials "took no steps to reprimand or

discharge" wrongdoers, "or if they otherwise failed to admit [their] conduct was in error");

*Henry v. County of Shasta*, 137 F.3d 1372, 1372 (9th Cir. 1998). This "subsequent acceptance of

dangerous recklessness by the policymaker tends to prove his preexisting disposition and

policy," and where there is no indication that the municipality took any corrective action, it is

reasonable to infer that such conduct is in accordance with a policy. *Grandstaff v. City of Borger,*

*Texas*, 767 F.2d 161, 171 (5th Cir. 1985). Plaintiffs have alleged as much in this case. [Doc. #1],

¶¶81-85,139-50.

Finally, this District has held that when a plaintiff provides examples to establish an

informal custom, such allegations must be taken as true when assessing a motion to dismiss.

*Estate of Valverde*, *supra,* at \*13 (holding that for purposes of a motion to dismiss the court must

"[treat] the specific examples as true" and noting that "[t]he outcome of any of the lawsuits is not

relevant to the issue at hand"); **Ex. 3**, *Cardenas-Villescas v. Greeley* (While city's argument that

"that the list of prior events is irrelevant because there is no evidence that the prior claims had

merit… might ultimately be correct, the Complaint alleges the former claims were meritorious

and some of the claims settled or resulted in opinions by judges in this district. Taking these

allegations as true, some of the prior claims may have had merit, which could establish a

widespread practice of excessive force."). At this stage, Plaintiffs need not establish that the

examples recited in their Complaint are meritorious; they have already pled that they are, and

---

[10] While the Tenth Circuit has relied on temporal proximity as inhibiting the use of this evidence under a *ratification* theory of liability as the sole probative evidence of *Monell* liability, it has not done so with regard to a custom and practice theory. This makes sense, as post-event evidence may evince an *ongoing* custom and practice that was already in place – and a moving force in the provision of deliberately indifferent medical care.

this Court must take these allegations in the light most favorable to Plaintiffs.

### 4. *Defendants Denver And Denver Health Tacitly Approved Of The Individual Defendants Engaging In The Above-Outlined Customs*

"Where plaintiff has alleged numerous instances of prior misconduct, similar to the misconduct alleged here, the Court can plausibly infer that the [municipality] had actual or constructive knowledge of the risk that the defendant officers would violate the constitutional rights of its citizens in this manner." *McComb v. Ross*, 202 F. Supp. 3d 11, 18 (D.D.C. 2016) (emphasis removed); *see also Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 773 (10th Cir. 2013). Plaintiffs have alleged six instances of prior similar misconduct by Defendants' officials and employees. [Doc. #1], ¶¶101-105,113-117. Plaintiffs have adequately alleged that Defendants knew, or had constructive knowledge, of the above-outlined customs.

### 5. *Defendants' Customs Caused Their Violation Of Plaintiffs' Constitutional Rights*

Plaintiffs allege Denver Health nurses and Denver officials, driven by Denver Health's and Denver's practices, training, and customs, exhibited deliberate indifference to Plaintiffs' obvious, serious medical needs, describing multiple, specific instances of the rampant deliberate indifference by Denver and Denver Health, and stating with specificity how through inadequate supervision, training, and discipline of deputies and nurses, they instilled these customs, policies, and/or practices as the standard operating procedure at Denver correctional facilities.[11] [Doc. #1],

---

[11] Given a chance for discovery, the individual Defendants will almost certainly defend by asserting that their conduct was pursuant to their training, policies and customs. This stipulation will be sufficient to maintain Defendants Denver and Denver Health as municipal defendants. *Moore v. Miller*, No. 10-cv-00651-JLK, 2014 U.S. Dist. LEXIS 72452, at *27 (D. Colo. May 28, 2014) ("[I]f Defendant Police Officers testify that they acted in accordance with their training and it is found that they committed constitutional violations, the reasonable inference is that, had the City implemented a different training policy on the use of force, [plaintiff] would not have been subjected to the amount of force used in this case."); *Ortega v. City & Cty. of Denver*, 944 F. Supp. 2d 1033, 1039 (D. Colo. 2013) ("[Officers] both testified that the amount of force that they used in this incident was in accord with how they were trained by Denver. Therefore, a

¶¶90,106-07. The incidents are described with sufficient detail to put Defendants on notice of the alleged policies connecting them.

### 6. Denver's And Denver Health's Abject Failure To Adequately Train, Supervise, And Discipline Their Officers Caused The Violation Of Plaintiffs' Constitutional Rights

It is not necessary at the pleading stage for Plaintiffs to identify all the particular deficiencies in Defendants' training, supervision, and discipline. Cf. *Walker*, *supra*, at \*14. Nonetheless, Plaintiffs' Complaint points to a number of specific shortcomings that existed before Defendants' interactions with Plaintiffs, *see, e.g.*, [Doc. #1], ¶¶125-38, and specifically alleges that these shortcomings were the moving force behind, and caused Plaintiffs' injuries. *Id*. Defendants' "failure to train amounts to deliberate indifference to the rights of persons with whom the [Denver's and Denver Health's agents] come into contact." *Allen v. Muskogee*, 119 F.3d 837, 841-42 (10th Cir. 1997). When all plausible inferences are drawn in Plaintiffs' favor, as they must be, it follows that Plaintiffs' constitutional harms would have been avoided had the Denver sheriffs and Denver Health nurses who violated Plaintiffs' rights "been trained under a program that was not deficient in the identified respect[s]." *See City of Canton v. Harris*, 489 U.S. 378, 391 (1989).

### 7. The Lack Of Adequate Staffing, In The Form Of An On-Duty OBGYN, Provides An Additional Basis For Holding Defendants Municipally Liable

The Tenth Circuit has held that a municipal defendant can be held liable for "[d]eliberate indifference to serious medical needs [when] there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia*, 768 F.2d at 308 (citing *Ramos*, 639 F.2d at 575). Denver's and Denver Health's failure to have an on-duty OBGYN physician's assistant (specifically, their failure to

---

reasonable juror could find that, had Denver implemented a different training policy on the use of force, Plaintiffs would not have been subjected to the amount force used in this case.").

ensure that when the OBGYN physician's assistant was on vacation that there was an appropriate replacement medical practitioner at the jail) and lack of proper tools in their delivery kit (once they finally could locate it) – especially when Defendants were aware that Ms. Sanchez was nearly full term and high risk – caused the deliberately indifferent care provided to Ms. Sanchez and Baby J.S.M. Defendants have a long history of understaffing correctional facilities and being placed on notice of understaffing failures. [Doc. #1], ¶¶125-138. This conscious disregard of staffing issues provides a further basis for their liability for the understaffing of the jail on the day of Ms. Sanchez's delivery. This is a separate basis for liability against Denver and Denver Health.

### J.   Plaintiffs' State Law Claims Against Denver Health Should Not Be Dismissed

Because, as demonstrated *supra*¸ Plaintiffs have adequately pled claims for violation of their constitutional rights, and because this Court has supplemental jurisdiction over Plaintiffs' pendent state law claims under 28 U.S.C. § 1367, this Court should retain jurisdiction over Plaintiffs' state law claims.[12]

### V.   CONCLUSION

Plaintiffs respectfully request that this Court deny Defendants' motions to dismiss.

DATED this 24th day of December 2019.

KILLMER, LANE & NEWMAN, LLP

*/s/ Mari Newman*

_____

Mari Newman
Andy McNulty
1543 Champa St., Ste. 400
Denver, CO 80202

---

[12] Denver Health Defendants do not assert that Plaintiffs have failed to adequately allege the state law claims against them, or that they are entitled to immunity from Plaintiffs' state law claims.

Phone: (303) 571-1000
Facsimile: (303) 571-1001
mnewman@kln-law.com
amcnulty@kln-law.com

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF COMPLAINCE AND SERVICE**

The forgoing Response, in compliance with Judge Domenico's Practice Standards and Order granting Plaintiffs' extension regarding word limitation, is 13,883 words.

I hereby certify that on December 24, 2019, I filed the foregoing via the CM/ECF system, which will send notice to the following:

Anthony Derwinski
Jeffrey C. Staudenmayer
Ruegsegger Simons & Stern
1700 Lincoln Street, Suite 4500
Denver, Colorado 80203
(303) 575-8026
(303) 623-1131
Fax: (303) 623-1141
aderwinski@rs3legal.com
jstaudenmayer@rs3legal.com

*Counsel for Denver Health Defendants*

Hollie Birkholz, Assistant City Attorney
Michele A. Horn, Assistant City Attorney
Denver City Attorney's Office
Litigation Section
201 West Colfax Ave., Dept. 1108
Denver, Colorado 80202
Telephone: (720) 913-3100
Facsimile: (720) 913-3190
hollie.birkholz@denvergov.org
michele.horn@denvergov.org

*Counsel for City and County of Denver and Denver Sheriff Defendants*

KILLMER, LANE & NEWMAN, LLP

*s/ Jesse Askeland*
_____

Jesse Askeland