FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
3:28 pm, Feb 26, 2020
JEFFREY P. COLWELL, CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-02437-DDD-NYW

DIANA SANCHEZ;
J.S.M., by and through his mother DIANA SANCHEZ,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER, COLORADO;
DENVER HEALTH AND HOSPITAL AUTHORITY d/b/a DENVER HEALTH MEDICAL CENTER;
RACHIME HERCH, in his individual and official capacities;
NINA CHACON, in her individual and official capacities;
DOROTHY GILKEY, in her individual and official capacities;
RIKKI WARMUS, in her individual and official capacities;
ALEXANDRA WHERRY, in her individual capacity;
MICHAEL HART, in his individual and official capacities;
TYSEN GARCIA, in his individual and official capacities;
JUSTIN ALBEE, in his individual and official capacities,

      Defendants.

---

**AMENDED COMPLAINT AND JURY DEMAND**

---

      Plaintiffs Diana Sanchez and J.S.M., by and through their attorneys Mari Newman and Andy McNulty of KILLMER, LANE & NEWMAN, LLP, respectfully allege for their Amended Complaint and Jury Demand as follows:

**<u>INTRODUCTION</u>**

      1.      On July 31, 2018, at 10:44 a.m., Plaintiff Diana Sanchez gave birth to a baby boy, J.S.M. But what should have been one of the happiest days of her life was instead a day of unnecessary terror, pain, and humiliation that continues to cause her on-going emotional trauma.

Ms. Sanchez was forced to deliver Baby J.S.M. on a cold, hard bench, feet away from a toilet, in a jail cell at the Denver County Jail, all alone and with no medical supervision or treatment. Ms. Sanchez had to endure this horrific experience despite the fact that multiple Denver Health nurses and Denver jail staff knew that: (1) she had been in active labor for hours, (2) she was days away from her due date, and (3) her water had broken hours before. Instead of ensuring that Ms. Sanchez was able to give birth in a safe and sanitary medical setting, Denver Health nurses and Denver Sheriff deputies callously made her labor alone for hours, and ultimately give birth alone in a dirty jail cell without any medical care, because it was *inconvenient* to take her to the hospital during the jail's booking process. Once Baby J.S.M. arrived, jail medical staff was totally unequipped to care for him. The outrageous conduct by Denver Health and Denver, and their respective officials, violated Ms. Sanchez's, and Baby J.S.M.'s, constitutional and state law rights. This suit is brought to hold to account the officials who cruelly chose convenience over compassion.

## JURISDICTION AND VENUE

2.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

3.      Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

4.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Amended Complaint.

5.      Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

6.      Plaintiffs sent a statutorily compliant CGIA notice of claims to all Defendants within the statutorily required period.

## PARTIES

7.      At all times relevant to this Amended Complaint, Plaintiff Diana Sanchez was a resident of and domiciled in the State of Colorado.

8.      At all times relevant to this Amended Complaint, Plaintiff Baby J.S.M. was resident of and domiciled in the State of Colorado.

9.      Defendant City and County of Denver ("Denver") is a Colorado municipal corporation. Denver's Department of Safety is responsible for the oversight, supervision, and training of both the Denver Police Department and the Denver Sheriff's Department. At all relevant times, Defendant Denver had a nondelegable duty to provide adequate medical care to inmates and detainees at the Denver County Jail.

10.     Denver Health was created in 1994 by Colorado statute and is a political subdivision of the State of Colorado. § 25-29-103(1), C.R.S. 2018; *see also* Ch. 126, sec. 1, § 25-29-103(1), 1994 Colo. Sess. Laws 657. At all times relevant to the subject matter of this litigation, Defendant Denver Health and Hospital Authority d/b/a Denver Health Medical Center ("Denver Health") acted under color of state law by providing medical services and care at the Jail pursuant to an agreement (or agreements) with the City and County of Denver.

11.     At all times relevant to this Amended Complaint and Jury Demand, Defendant
Rachime Herch was a resident and domiciled in of the State of Colorado. At all relevant times,
Defendant Herch was acting within the scope of his official duties and employment and under
color of state law in his capacity as a nurse for Denver Health at the Denver County Jail.

12.     At all times relevant to this Amended Complaint and Jury Demand, Defendant
Nina Chacon was a resident of and domiciled in the State of Colorado. At all relevant times,
Defendant Chacon was acting within the scope of her official duties and employment and under
color of state law in her capacity as a nurse for Denver Health at the Denver County Jail.

13.     At all times relevant to this Amended Complaint and Jury Demand, Defendant
Dorothy Gilkey was a resident of and domiciled in the State of Colorado. At all relevant times,
Defendant Gilkey was acting within the scope of her official duties and employment and under
color of state law in her capacity as a nurse for Denver Health at the Denver County Jail.

14.     At all times relevant to this Amended Complaint and Jury Demand, Defendant
Rikki Warmus was a resident of and domiciled in the State of Colorado. At all relevant times,
Defendant Warmus was acting within the scope of her official duties and employment and under
color of state law in her capacity as a medical professional for Denver Health at the Denver
County Jail.

15.   At all times relevant to this Amended Complaint and Jury Demand, Defendant
Alexandra Wherry was a resident of and domiciled in the State of Colorado. At all relevant
times, Defendant Wherry was acting within the scope of her official duties and employment and
under color of state law in her capacity as a deputy for the City and County of Denver at the
Denver County Jail.

16.     At all times relevant to this Amended Complaint and Jury Demand, Defendant Michael Hart was a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Hart was acting within the scope of his official duties and employment and under color of state law in his capacity as a deputy for the City and County of Denver at the Denver County Jail.

17.     At all times relevant to this Amended Complaint and Jury Demand, Defendant Tysen Garcia was a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Garcia was acting within the scope of his official duties and employment and under color of state law in his capacity as a deputy for the City and County of Denver at the Denver County Jail.

18.     At all times relevant to this Amended Complaint and Jury Demand, Defendant Justin Albee was a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Albee was acting within the scope of his official duties and employment and under color of state law in his capacity as a deputy for the City and County of Denver at the Denver County Jail.

## **CERTIFICATE OF REVIEW**

19.     Pursuant to C.R.S. § 13-20-602(3)(a), counsel certify as follows:

a.  Counsel have consulted with medical professionals with expertise in the areas of the alleged negligent conduct as set forth in Plaintiffs' Amended Complaint;

b. The medical professionals who have been consulted have reviewed all known facts relevant to the allegations of negligent conduct as complained of in Plaintiffs' Amended Complaint;

c. Based upon review of such facts, the medical professionals have concluded that the filing of the claims against Defendants does not lack substantial justification within the meaning of C.R.S. § 13-17-102(4); and

d. The medical professionals who have reviewed all known facts relevant to the allegations of negligent conduct as contained in Plaintiffs' Amended Complaint meet the requirements set forth in C.R.S. § 13-64-401.

## FACTUAL ALLEGATIONS

20.     On July 14, 2018, Ms. Sanchez was booked into the Denver County Jail.

21.     During the booking process, Ms. Sanchez was interviewed by Denver Health personnel, who noted on Ms. Sanchez's Denver Sheriff Department's Health Services Questionnaire that Ms. Sanchez was over eight months pregnant. The Denver Health personnel also noted on the questionnaire that Ms. Sanchez's due date was August 9, 2018.

22.     The questionnaire also stated that Ms. Sanchez was taking prescribed medication requiring observation.

23.     In a Hospital Return Phone Report, completed on July 15, 2018 at 12:37 p.m., a Denver Health Services clerk noted in Ms. Sanchez's medical record that Ms. Sanchez had medical conditions associated with an increased risk of premature birth. At that time, it was also noted that Ms. Sanchez was 30% effaced and 1-2 cm dilated, but had not been having contractions. Ms. Sanchez was in the early stages of labor.

24.    On July 30, 2018, Ms. Sanchez was examined by Denver Health Nurse J. Kim. Ms. Sanchez told Nurse Kim that she was not in distress, had no abdominal pain, and was not bleeding vaginally. Nurse Kim advised Ms. Sanchez that she needed to ensure that she received medical attention *immediately* if she started having contractions or if she noticed any fluid leaking from her vagina. Ms. Sanchez, whose primary concern was the safety of her baby, confirmed to Nurse Kim that she understood the paramount importance of reporting these symptoms and would follow her directions.

25.    Early the next morning, July 31, 2018, Ms. Sanchez alerted Denver deputies (who in turn alerted Denver Health nurses) that she was in active labor. At approximately 5:00 a.m., Ms. Sanchez told the deputy who delivered her breakfast that she had been experiencing contractions that morning.

26.    Ms. Sanchez spoke with Denver deputies and Denver Health nurses at least eight times that morning, informing them each time that she was experiencing contractions.

27.    For the next 4-5 hours, Ms. Sanchez labored alone in her cell while Denver and Denver Health failed to provide medical care or transport her to a hospital.

28.    The entirety of Ms. Sanchez's long and painful labor was readily obvious to both Denver and Denver Health jail staff who were responsible for monitoring her via a live video feed from her cell.

29.    At approximately 9:43 a.m., as Ms. Sanchez's labor pains became even more acute, she again clearly alerted Denver jail staff that childbirth was imminent. Ms. Sanchez informed Deputy Alexandra Wherry that: (1) her water had broken, and (2) she was experiencing abdominal pain.

30.     In response to Ms. Sanchez's clear notification that she was in labor, Deputy Wherry contacted Nurse Chacon, and relayed to Nurse Chacon what Ms. Sanchez had told her.

31.     Nurse Chacon, Nurse Gilkey, and Behavioral Healthcare Technician Warmus examined Ms. Sanchez and/or were present for the examination of Ms. Sanchez.

32.     Nurse Chacon noted in her medical chart that: (1) Ms. Sanchez reported that she had been experiencing contractions since 5:00 a.m. (and that the contractions had been constant), (2) Ms. Sanchez's underwear was wet and bloody, and (3) Ms. Sanchez's report that her water had broken.

33.     Nurse Gilkey likewise noted in her medical chart that: (1) Ms. Sanchez had reported continuous contractions since 5:00 a.m., (2) her water had broken at 5:00 a.m., and (3) she observed blood on Ms. Sanchez's underwear.

34.     Defendant Warmus was present during some or all of the examination, but Defendants have provided no notes from her. Upon information and belief, Defendant Warmus was also aware of Ms. Sanchez's report that her water had broken, that had been experiencing contractions, and/or that she had blood in her underwear.

35.     Defendant Gilkey's indifference to Ms. Sanchez's and Baby J.S.M.'s obvious, serious medical needs is illustrated by her failure to make a nursing note until nearly three weeks later, on August 20, 2018.  Even then, she did not even bother to enter the right date, and instead erroneously wrote that she had seen Ms. Sanchez on August 7, 2018 (though clearly referring to the July 31 events).

36.     Denver deputies, Nurse Chacon, Nurse Gilkey, and (upon information and belief) Technician Warmus knew almost an hour before Ms. Sanchez gave birth that her water had broken, she was in active labor, and that the delivery of her child was imminent.

37.     Instead of getting Ms. Sanchez and her baby immediate medical attention, Deputy Wherry, Nurse Chacon, Nurse Gilkey, and Technician Warmus deliberately chose to take a "wait and see" approach to their care, as though it were not patently obvious to anyone — with or without medical training — that Ms. Sanchez was in labor and required immediate medical attention.

38.     Shortly after speaking with Ms. Sanchez at 9:43 a.m., Deputy Wherry took a meal break. Deputy Wherry took this break without ensuring that Ms. Sanchez was transported to an appropriate medical facility.

39.     Nurse Chacon, Nurse Gilkey, and Technician Warmus remained on duty, but utterly failed to discharge their responsibility to provide medical care to Ms. Sanchez and the baby that would soon be born. These nurses did not order an ambulance to bring Ms. Sanchez to a hospital, even though they knew that (1) Ms. Sanchez had been reporting to jail and medical staff "constant" contractions that had begun nearly five hours earlier, (2) Ms. Sanchez's water had clearly broken, and (3) Ms. Sanchez was bleeding vaginally. Instead, Nurse Chacon only provided Ms. Sanchez with an absorbent pad to place beneath her body.

40.     No nurse used litmus paper to test the fluids that Ms. Sanchez reported as the result of her water breaking. Such a test would have allowed the nurses to confirm that the fluids likely included amniotic fluid, a sure sign that Ms. Sanchez's water had broken.

41.    Nurse Chacon then informed Deputy Michael Hart of the symptoms that Ms.
Sanchez was experiencing and requested only a *non-emergent* van run to the hospital.

42.    Pursuant to Denver Health's written policy, pregnant inmates with contractions
after 36 weeks are to be sent to the Denver Health OB Screening Room by emergency
ambulance, and patients who **state** they have broken their water are to be sent to Denver Health
OB Screening by emergency ambulance.  Ms. Sanchez clearly satisfied both of these conditions.

43.    Nurse Chacon later told Deputy Justin Albee that she knew that Ms. Sanchez's
water had broken prior to the ordering of the non-emergent van run.

44.    By this time, Deputy Hart had already been alerted by Ms. Sanchez multiple
times, and was already well aware that she was in active labor (even without the additional
information from Nurse Chacon).

45.    At approximately 10:20 a.m., Deputy Hart contacted Sergeant Tysen Garcia.
Deputy Hart told Sergeant Garcia about Ms. Sanchez's symptoms—including her report that her
water had broken—and requested a non-emergent van run. Sergeant Garcia asked Deputy Hart if
Ms. Sanchez had been seen by medical staff because he knew that if Ms. Sanchez's water had
broken, they needed to request an ambulance.  Denver Sheriff's personnel knew what was
obvious even to a layperson: that Ms. Sanchez's water breaking was an extremely obvious sign
that Ms. Sanchez needed to be taken emergently to the hospital by ambulance.

46.    Despite this, Deputy Hart and Sergeant Garcia (and no Denver deputy or sergeant
for that matter) took any action to ensure that an ambulance was called for Ms. Sanchez.

47.    Instead, Sergeant Garcia ordered the non-emergent van run. Sergeant Garcia did
not call for an ambulance despite knowing that "book-ins" had just begun at the jail, and that the

logistics of jail operations dictated that book-ins would be completed before a non-emergent van run to the hospital would be made. Thus, Sergeant Garcia knew it would take at least an hour, and would likely take multiple hours, before Ms. Sanchez would be taken to the hospital.

48.    At Sergeant Garcia's request, Deputy Hart told Nurse Chacon that book-ins would end at 11:00 a.m. at the earliest, and 12:00 p.m. at the latest. Still, Nurse Chacon told Deputy Hart (who told Sergeant Garcia) that the non-emergent van run was fine.

49.    There is no question that Deputy Wherry, Deputy Hart, Sergeant Garcia, Nurse Chacon, Nurse Gilkey, and (upon information and belief) Technician Warmus knew at this point that Ms. Sanchez was exhibiting signs that required immediate medical attention at a hospital. But none of these individuals took any action to call for an ambulance or otherwise ensure Ms. Sanchez was transported to an appropriate medical setting in a timely manner.

50.    During this same time period, Deputy Albee and Deputy Hart had conversations about Ms. Sanchez, during which both acknowledged their awareness that Ms. Sanchez needed immediate emergency medical attention. Deputy Albee and Deputy Hart discussed the fact that Ms. Sanchez's water had broken and speculated as to why she was not being transported via ambulance. Despite this knowledge that Ms. Sanchez needed to be transported to a hospital immediately, Deputy Albee and Deputy Hart did not call for an ambulance or in any other way ensure that Ms. Sanchez received immediate emergency transportation to an appropriate medical facility.

51.    Throughout this entire time, Ms. Sanchez's painful labor was obvious to jail and medical staff alike, via a video feed from her cell. Despite the fact that Denver and Denver

Health medical staff were supposed to be monitoring her via video, they took no action to

provide the emergency medical care that was so obviously necessary.

52.     At 10:36 a.m., Ms. Sanchez screamed from her cell. Ms. Sanchez was in the

throes of labor. Deputy Wherry (who had returned from her break) heard Ms. Sanchez's cries for

help and, when she got to Ms. Sanchez's cell, observed that the absorbent pad that Nurse Chacon

provided to Ms. Sanchez was soaked.

53.     Deputy Wherry immediately informed Nurse Herch that the absorbent pad that

Nurse Chacon had provided to Ms. Sanchez was soaked and that Ms. Sanchez was clearly in

excruciating pain. By this time, Denver jail personnel and Denver Health's nursing staff was

aware that Ms. Sanchez had been in labor for nearly five and a half hours.

54.     Despite the obvious urgency of the situation, Nurse Herch failed to do anything at

all to assist Ms. Sanchez. Astoundingly, Nurse Herch responded that Ms. Sanchez was already

scheduled to go to the hospital and, therefore, did not need any medical care. Deputy Wherry

informed Nurse Herch that the van run would be on a non-emergent basis and that Ms. Sanchez

was about to experience childbirth. Nurse Herch lackadaisically acknowledged that he was aware

of this fact but told Deputy Wherry that Ms. Sanchez would simply have to wait for the non-

emergent van run and for the booking process to end.

55.     Despite knowing that Nurse Herch was going to do nothing to ensure that Ms.

Sanchez or her baby received necessary immediate and emergent medical care, Deputy Wherry

did not call 911 or take any other actions to ensure that Ms. Sanchez or her baby received the

medical care that they obviously needed (including informing her supervisors, nursing

supervisors, or simply calling 911).

56.     Deputy Wherry knew that Ms. Sanchez would give birth prior to the end of the booking process and, in anticipation of having to help deliver Ms. Sanchez's child, donned gloves and returned to her post just outside Ms. Sanchez's cell. Despite this knowledge, Deputy Wherry did not call for an ambulance.

57.     By 10:42 a.m., Ms. Sanchez was screaming in pain, and Nurse Herch was still at the nursing station. Frustrated with Nurse Herch's slow response, Deputy Wherry sent Deputy Hart to get him. Nurse Herch was on the phone and told Deputy Hart not to bother him until he was off the phone.

58.     Having observed Nurse Herch's dogged refusal to care for Ms. Sanchez (and Baby J.S.M., who was clearly on the way), Deputy Wherry called for other nurses who had gone to help with book-ins. However, she still did not call for emergent transport of Ms. Sanchez to a hospital.

59.     Realizing that no medical care was forthcoming, and that she could wait no longer, Ms. Sanchez removed her underwear and prepared to deliver the Baby J.S.M. on her own. This too, was captured by the video feed from Ms. Sanchez's cell, yet no medical care was provided to her.

60.     Ms. Sanchez yelled that the baby was coming, and Deputy Wherry could see that the baby was crowning. Deputy Wherry waved her arms and yelled at Nurse Herch to come immediately because the baby was coming. Deputy Wherry also, again, yelled over the radio for the other nurses to return to medical to assist Ms. Sanchez. No nurse would arrive until after Ms. Sanchez had delivered her baby.

61.    Ms. Sanchez and Baby J.S.M. were totally alone as she labored and as she gave birth; surveillance camera footage confirms that the last time a nurse had seen Ms. Sanchez was approximately an hour beforehand at approximately 9:53 a.m., even though she had been screaming in pain and begging the deputy at her door to get help as the birth approached. Despite the obvious urgency of the situation, Denver Health nurses and Denver Sheriffs did nothing to ensure that she was provided medical care during the birth of Baby J.S.M.

62.    Ms. Sanchez delivered Baby J.S.M. on the bench in her cell without any medical assistance or care whatsoever.

63.    Only after Ms. Sanchez delivered Baby J.S.M. did Nurse Herch casually *stroll* over to the cell.

64.    When he eventually arrived at the cell, Nurse Herch awkwardly took Baby J.S.M. and patted him on the back.

65.    Nurse Herch was so overwhelmingly indifferent to Ms. Sanchez's and Baby J.S.M.'s obvious, serious medical needs that he did not so much as make a nursing note regarding the delivery for a week after the event, when he created a "late entry" acknowledging that he had been aware of the emergent nature of Ms. Sanchez's condition. This indifferent approach to his note-taking, abbreviated and well after the fact, is illustrative of the non-existent medical care he provided to Ms. Sanchez and her Baby J.S.M.

66.    Even after Ms. Sanchez had delivered Baby J.S.M., and numerous Denver sergeants, deputies, and Denver Health nurses had belatedly responded to Ms. Sanchez's cell, the Denver Health nursing staff proved totally disorganized and unprepared to care for Baby J.S.M. or Ms. Sanchez.

67.    Denver and Denver Health failed to provide Baby J.S.M. with even the most basic post-delivery medical care.

68.    Nurse Angela Johnson, the first nurse to arrive on scene after Nurse Herch, asked for clamps to assist in severing the umbilical cord, and Sergeant Moore relayed this request to the rest of the nursing staff. Despite multiple requests, no clamps were found.

69.    A few minutes later, Nurse Johnson requested an "OBGYN Kit" from PA Cynthia Bean's office. Despite the extensive, hours-long notice of Ms. Sanchez's labor, the nursing staff had not accessed the kit prior to the actual birth of Baby J.S.M. Deputy Wherry and Sergeant Moore accompanied Nurse Diane Knuppel to the office to retrieve the kit, which contained only a single clamp, insufficient to safely clamp and sever the umbilical cord. Denver Health nurses also failed to find an appropriate device to sever the umbilical cord; even if they had had sufficient clamps on hand, they would not have been able to actually cut the cord.  Denver Health nursing staff never was able to come up with the necessary equipment, and was unable to clamp and sever the umbilicus.

70.    At approximately 10:58, members of the Denver Fire Department arrived at Ms. Sanchez's cell and took over care for Ms. Sanchez and Baby J.S.M.. Although they had been called earlier, Denver Health paramedics arrived several minutes later and joined the Fire Department in caring for Ms. Sanchez and Baby J.S.M. At 11:16 a.m., Ms. Sanchez and her newborn son left Denver County Jail to be transported to Denver Health Medical Center ("DHMC").

71.    For two minutes after the birth, no nurse dried or warmed Baby J.S.M.

72.    Nurses were excessively rough with Baby J.S.M.

73.     For several minutes (or more), no nurse at Denver County Jail cleared the mucus from Baby J.S.M.'s nose and mouth.

74.     The Denver Health paramedics reported that, when they eventually arrived about 17 minutes after the birth, their Primary Impression of Baby J.S.M. was that he was suffering from Acute Respiratory Distress.

75.     Paramedics also reported upon arrival that Baby J.S.M. had acrocyanosis, a discoloration of the extremities resulting from insufficient oxygen reaching the extremities due to weak circulation.

76.     No nurse at Denver County Jail used suction or provided oxygen to Baby J.S.M., or took any other action to assist with his Acute Respiratory Distress or acrocyanosis.

77.     No nurse at Denver County Jail applied antibiotic or antiseptic eyedrops to Baby J.S.M. to prevent eye infection.

78.     No nurse at Denver County Jail provided Baby J.S.M. with a vitamin K injection after the birth.

79.     No nurse at Denver County Jail provided Baby J.S.M. with a cap to warm his head.

80.     No nurse at Denver County Jail provided Baby J.S.M. with a hepatitis B virus vaccine.

81.     No nurse at the Denver County Jail took any steps to provide necessary care to address risk factors to Baby J.S.M. associated with Ms. Sanchez's use of prescribed medication, or other high-risk prenatal issues.

82.     No nurse at Denver County Jail weighed or otherwise measured Baby J.S.M.

83.     No nurse at the Denver County Jail took any action to evaluate or treat Ms.

Sanchez's boggy uterus.

84.     No nurse at Denver County Jail provided Baby J.S.M. with an identifying medical

bracelet.

85.     Denver and Denver Health's failure to provide Baby J.S.M. with even the most

basic post-delivery care was not just negligent, it was deliberately indifferent to his obvious,

serious medical needs.

86.     Had the nursing staff simply taken Ms. Sanchez seriously when she initially told

Nurse Chacon, Nurse Gilkey, and (upon information and belief) Technician Warmus that her

water had broken and that she had been experiencing contractions, Denver Sheriffs and Denver

Health could easily have transported her to DHMC before giving birth. Denver and Denver

Health knew that Ms. Sanchez was only nine days short of her due date, with multiple risk

factors for premature delivery. Both Denver Sheriffs and the Denver Health nursing staff

certainly were aware that she could go into labor at any time. Surveillance video confirms that

Ms. Sanchez spoke with Denver Sheriff deputies and Denver Health medical staff, and informed

them that she was experiencing contractions and vaginal leakage, at least eight times between her

first contraction at approximately 5:00 a.m. and the birth of Baby J.S.M.

87.     Denver Sheriff deputies had a duty to not only to inform Denver Health nursing

staff of Ms. Sanchez's condition, but also to ensure that she was taken to the hospital on an

emergent basis for both her safety and the safety of Baby J.S.M.

88.    Denver Health nursing staff had a duty to provide appropriate treatment to Ms. Sanchez and to Baby J.S.M. at the outset of Ms. Sanchez's symptoms and during the course of her labor and childbirth.

89.    Surveillance video clearly demonstrates that both Denver Sheriff and Denver Health personnel utterly failed to satisfy their legal and moral duty.

90.    Moreover, the Denver Health nursing staff was aware that Ms. Sanchez was at heightened risk for preterm delivery. The medical staff at the Denver County Jail were aware that Ms. Sanchez had been treated for a medical condition less than a month before she gave birth that is known to cause a have a higher incidence of preterm delivery and other risks. Likewise, Denver Health nurses at the jail were on notice that Ms. Sanchez had been prescribed medication associated with the potential for preterm delivery and other risks. Both of these risk factors were documented in Ms. Sanchez's medical records and put the Denver Health nurses on notice that Ms. Sanchez had a high-risk pregnancy that required special attention for both her and Baby J.S.M.

91.    Despite access to all of this information—and Ms. Sanchez's literal screams for help—Denver jail staff and Denver Health nurses unjustifiably delayed transporting Ms. Sanchez to the hospital, simply to accommodate the jail's scheduled book-ins. The book-ins could have waited; Ms. Sanchez and Baby J.S.M. could not.

92.    As Baby J.S.M. arrived, Nurse Herch could not be bothered to so much as acknowledge Ms. Sanchez's existence. Ms. Sanchez endured the physical and emotional agony of childbirth alone, a few feet from a toilet bowl, on a thin jail mattress soaked with her blood and amniotic fluid, because the Denver jail staff and Denver Health nurses responsible for her

care decided to risk her well-being and that of Baby J.S.M. rather than go to the trouble of calling an ambulance.

93.    Beyond the absence of appropriate medical assistance—or indeed, any medical assistance—at the time of birth, the setting of Ms. Sanchez's cell was plainly inappropriate and dangerous for delivery, both for Ms. Sanchez and for Baby J.S.M.

94.    The cell was plainly not sanitary, and Denver and Denver Health staff did not take appropriate steps to protect Ms. Sanchez or Baby J.S.M. When Denver Health nurses finally arrived, at least one nurse can be seen brushing her hair with the same gloved hand she uses to hold Baby J.S.M., as well as wiping her mouth and nose with her wrist and then continuing to handle Baby J.S.M.

95.    Denver County Jail's medical unit lacked the trained personnel and medical equipment necessary to address the numerous, potentially medically complicated emergency situations that could have accompanied any birth, and particularly a high-risk birth faced by Ms. Sanchez and Baby J.S.M.

96.    PA Bean, the facility's OBGYN, was on vacation during the week of this incident, apparently without any substitute coverage. Absent this critical staff member, the Denver County Jail's medical staff was even less prepared to deal with any potential complications of Ms. Sanchez's pregnancy or delivery than ordinarily it would have been. Despite knowing that Ms. Sanchez was less than a week from term (and in the midst of a high-risk pregnancy), Denver and Denver Health did nothing to ensure that there was an OBGYN on-duty at the Denver County Jail.

97.     The Denver Health nursing staff at the Denver County Jail had not even accessed the facility's limited "delivery kit" prior to Ms. Sanchez's delivery and Baby J.S.M.'s birth, despite being on notice that Ms. Sanchez was in active labor, and had to run to retrieve it from PA Bean's office *after* Ms. Sanchez had already given birth to Baby J.S.M.

98.     No accounting was made for the fact that Ms. Sanchez was taking prescription medication or for the potential for baby J.S.M. to suffer related complications upon birth, even though the nursing staff was aware of this danger.

99.     After the birth, before she had even seen Ms. Sanchez or Baby J.S.M., Sergeant Tracy Moore immediately called for an emergency ambulance to respond to the facility and take Ms. Sanchez and Baby J.S.M. to Denver Health Medical Center—a step that was necessary because Denver County Jail did not have the capacity to provide post-partum medical care for Ms. Sanchez or Baby J.S.M. This is a call that should have been made immediately upon Ms. Sanchez's first report of contractions, and certainly when her water broke, but was not because of the deliberate indifference of both Denver and Denver Health.

**Denver ratified its deputies' failure to provide critical and necessary medical care to Ms. Sanchez and Baby J.S.M.**

100.    In a letter dated November 13, 2018, the Denver Sheriff Department ("DSD") Internal Affairs Bureau ("IAB") notified its deputies, and the public, that no one would be disciplined, or otherwise reprimanded, for their actions relating to their failure to provide medical treatment for Ms. Sanchez or Baby J.S.M. in the Denver County Jail. More specifically, the Captain of the DSD IAB found that there were no policy violations or misconduct on the part of any DSD personnel.

101.    Despite reviewing the video of the incident, recorded statements of the Denver
deputies and Denver Health nurses, reports, and other evidence, Denver affirmatively chose to
ratify the conduct of its deputies. Denver's ratification of its deputies' misconduct, and
particularly its deputies' deliberate indifference to serious medical needs, is customary. Denver
deputies know that they will face no discipline, or even reprimand, for failing to ensure that those
with obvious, serious medical needs are provided with necessary treatment.

102.    The Captain of the DSD IAB was the Denver employee with the final
policymaking authority, and he had authority over the subordinate law enforcement officers.

103.    Through the determinations of the Captain of the DSD IAB, Denver ratified the
unconstitutional practices of Defendants Hart, Garcia, Albee, and others.

104.    Upon information and belief, and based on Denver's responses to open records
requests, Denver has provided no additional training to any Defendant or other Denver deputy
related to the incident with Plaintiffs.

**Defendant Denver's and Denver Health's customs, policies, and/or practices caused
the violations of Plaintiffs' constitutional rights.**

105.    Defendants' woefully inadequate treatment of Plaintiffs was pursuant to Denver's
and Denver Health's customs, policies and/or practices of unlawful conduct, including:

    a.    Taking a "wait and see" approach to providing medical care to inmates who
are suffering from obvious, serious medical needs that require immediate
attention;

    b.    Failing to provide care based on automatic assumptions that inmates are lying
about, faking, or exaggerating their symptoms;

    c.    Failing to provide care due to prioritizing convenience over necessary medical
treatment;

     d.   Failing to discipline officers and jail medical personnel, or even find the officers and jail medical personnel engaged in wrongdoing, in the face of obvious constitutional violations (thereby ensuring that officers and medical personnel would repeatedly, and customarily, violate the constitutional rights of inmates);

     e.   Failing to adequately train their officers and jail medical providers; and

     f.   Failing to adequately staff its detention facilities.

106.    Pursuant to these customs, policies and/or practices Denver deputies and Denver Health nurses delay necessary medical care for inmates, cause them suffering, harm, and irreparable damage. In other words, Denver deputies and Denver Health nurses customarily ignore inmate requests for medical care until it is too late.

107.    These customs, policies, and/or practices have caused Denver deputies and Denver Health nurses to provide deliberately indifferent medical care and have resulted in inmate deaths, serious injuries, and unnecessary pain, suffering, humiliation, and emotional trauma.

108.    Denver and Denver Health have a longstanding, widespread, and deliberately indifferent custom, habit, practice and/or policy of condoning and ratifying: (1) their deputies and nurses taking a wait and see approach to providing medical care to inmates who require immediate medical attention, (2) their deputies' and nurses' categorical assumptions that inmates are faking or exaggerating their medical conditions, and (3) failing to provide care due to prioritizing convenience over necessary medical treatment.

109.    Denver Health and Denver have, through inadequate supervision, training, and discipline of deputies and nurses, instilled these customs, policies, and/or practices as the standard operating procedure at Denver correctional facilities.

**Denver's and Denver Health's persistent failure to provide even minimal proper
healthcare demonstrates their unconstitutional customs, policies and/or practices.**

100.    The following examples are emblematic of Denver's and Denver Health's

customs, policies, and practices of: (1) taking a "wait and see" approach to providing medical

care to inmates who are suffering from obvious, serious medical needs that require immediate

attention; (2) failing to provide care based on automatic assumptions that inmates are lying

about, faking, or exaggerating, their symptoms; (3) failing to provide care due to prioritizing

convenience over necessary medical treatment. These customs, policies, and practices are

caused, in whole or at the very least in part, by Denver and Denver Health's failure adequately

train or to discipline officers and nurses, or even find them to have engaged in wrongdoing, in

the face of obvious constitutional violations.

101.    In November 2015, Denver deputies and Denver Health medical care providers

were deliberately indifferent to the serious medical needs of Michael Marshall. Mr. Marshall was

arrested and booked at Van Cise-Simonet Detention Center in Denver for the minor, non-violent

offense of trespassing. He was held on just $100 bond. Mr. Marshall was homeless, 50 years old,

5'4'' tall, and weighed just 112 pounds at the time. On the evening of November 11, 2015, while

Mr. Marshall was suffering from a non-violent mental health crisis, Denver deputies responded

by forcibly restraining him, violently flinging him to a bench, wrenching his hands behind his

back, throwing him face-down on the concrete floor, clamping an OPN on his angle so tightly as

to break the device, and suffocating him under the weight of hundreds of pounds of deputies. As

Mr. Marshall choked and aspirated on his own vomit and lost consciousness, Denver deputies

and sergeants, and Denver Health nurses refused to provide him life-saving medical care, and

instead strapped Michael Marshall's limp body into a restraint chair and further restricted his

breathing with a spit mask. Mr. Marshall was eventually taken to Denver Health Hospital, where
he died because of Denver Sheriff's excessive force and Denver Sheriffs' and Denver Health
nurses' failure to provide him with the medical care that he so obviously and desperately needed.
The Denver Coroner determined that Mr. Marshall's death was a homicide. The homicide of
Michael Marshall provides yet another example of Denver's intractable custom, pattern, and
practice of deliberate indifference to the constitutional rights of its citizens, and the City's and
Denver Health's failure to adequately train, supervise and discipline law enforcement officers
and jail medical providers regarding deliberate indifference to the obvious serious medical needs
of inmates/detainees. Just a few of the involved Denver Sheriffs were disciplined with very short
unpaid time off. In its decision reversing the suspensions of the two deputies, the City's Career
Services Board Hearing officer noted that they City's own internal investigation had
recommended that no discipline imposed. One of the most culpable officers quit in order to avoid
discipline, and was subsequently hired as a Denver Police Officer. Denver, incredibly, did not
have an on-duty mental health care provider at the jail at the time of Mr. Marshall's death,
despite knowing that approximately half of the detainees in Denver detention centers suffer from
mental illness, and that jail staff were likely to encounter those suffering from mental illness
regularly and in the ordinary course of carrying out their responsibilities.  Denver and Denver
Health settled Mr. Marshall's claims for $5.3 million.

    102.    In October 2014, Denver deputies and Denver Health medical care providers were
deliberately indifferent to the serious medical needs of George Moore. Mr. Moore was arrested
on October 9, 2014 and brought to intake at the Denver City Jail. During intake, Mr. Moore met
with Denver Health Nurse Zimmer and informed her that he needed a cane or walker because of

his stability issues. He further informed Nurse Zimmer that he was in tremendous pain standing

up, sitting down, and walking, and that he was disabled as defined in Title II of the Americans

with Disabilities Act. Nurse Zimmer told Mr. Moore she did not have time to verify his request

because she had forty other inmates to deal with and that he'd have to "deal with it" upstairs on

the floor where he'd be staying. Mr. Moore asked to see Nurse Zimmer's supervisor, but Nurse

Zimmer responded that her supervisor would also tell him to address his concerns upstairs. When

Mr. Moore was moved upstairs that evening, a deputy informed him that medical was closed and

he would not be allowed to see them at that time. The next day, Mr. Moore's left hip gave out

and he collapsed to the floor, causing additional pain to his hip, groin, and lower back. Denver

Health medical staff did not provide Mr. Moore with a walker until three hours after he fell.

After falling, Mr. Moore consistently requested medical attention for his hip, but was denied any

further medical attention until two months later. The doctor he saw outside the jail put in an

order for Mr. Moore to get hip surgery, but medical staff at the Denver City Jail refused to

schedule Mr. Moore for surgery because he was a pretrial detainee, not serving a sentence. He

never received surgery. Upon information and belief, no Denver deputy nor Denver Health nurse

was disciplined for their failure to provide constitutional care to Mr. Moore.

      103.     In July 2012, Denver deputies and Denver Health medical care providers were

deliberately indifferent to the serious medical needs of Rebecca Trujillo. While in the Denver

County Jail, Ms. Trujillo suffered a serious spinal cord injury. Despite exhibiting obvious,

serious signs of a spinal cord injury, including chronic pain, loss of control of bowel movements,

slowed speech, altered gait, and reduced ability to use her hands and legs, Denver deputies and

Denver Health nurses failed to ensure that Ms. Trujillo was provided with appropriate medical

care. Following Ms. Trujillo's release, she received surgery for her spinal injuries and her

surgeon told her that her injuries were exacerbated by Denver deputies' and Denver Health

nurses' failure to ensure she was provided with appropriate medical treatment. Upon information

and belief, no Denver deputy nor Denver Health nurse was disciplined for their failure to provide

constitutional care to Ms. Trujillo.

104.    On July 9, 2010, Denver deputies and Denver Health medical care providers were

deliberately indifferent to the serious medical needs of Marvin Booker. Mr. Booker was killed in

the City and County of Denver's Van Cise-Simonet Detention Center, after five Denver Sheriff's

Department Deputies piled on top of him and implemented multiple use of force techniques on

him simultaneously.  The types of force used on Mr. Booker included a carotid restraint (or

"sleeper hold") on his nick, a Taser to his back, handcuffs of his arms behind his back, and

nunchucks to restrain his legs and feet.  Mr. Booker was 56 years old, weighed only 135 pounds,

and stood 5'5" tall. Two Denver Health nurses witnessed much of the deputies' interaction with

Mr. Booker, including the use of the carotid chokehold and the Taser, but left the scene during

the physical restraint in order to attend to some unrelated paperwork.  The nurses had to be

summoned three times before they were willing to provide any medical assistance whatsoever to

Mr. Booker. At least one nurse testified that Mr. Booker was "acting like" he was unconscious,

and another nurse stated in her IAB interview that inmates pretend like they are unresponsive in

order to get attention. None of the Denver deputies or nurses involved in the death of Mr. Booker

was disciplined for the failure to provide constitutional care to Mr. Booker. A jury returned a

verdict of $4.65 million, finding that Denver deputies had violated Mr. Booker's constitutional

rights. Prior to trial, Denver stipulated to *Monell* liability, and Denver Health settled claims against it.

105.    In 2008, Denver deputies and Denver Health medical care providers were deliberately indifferent to the obvious, serious medical needs of Timothy Thomason. Mr. Thomason was arrested on charges of cultivating marijuana. While being transported to jail, he informed the officers that he was suffering from terminal Stage IV non-Hodgkin lymphoma, and that he was taking massive amounts of pain killers and anxiety medications. The officers assured him that they would bring his medications to the jail. Once he arrived at the Pre-Arraignment Detention Facility, however, Denver sheriffs ignored his repeated pleas for medication. A judge ordered his release, but Denver forced him to spend several more hours in jail, without his medication, until he suffered a seizure, banging his head on the cement floor of his cell. Mr. Thomason alleged that his treatment by the Denver Sheriff's Department violated his constitutional rights. Denver paid $150,000 to settle Mr. Thomason's claims.

106.    These cases provide only representative examples of the rampant deliberate indifference to serious medical needs by Denver law enforcement officers and Denver Health nurses, and the lack of adequate training or supervision on the part of the Denver and Denver Health to prevent these dangerous and unlawful patterns of conduct.

107.    The lawsuits and other incidents involving deliberate indifference to serious medical needs and cover ups identified above are illustrative of the culture and customs, policies, and practices that existed during the incident outlined in this Amended Complaint, were the result of Denver's and Denver Health's conscious and deliberate policy choices, and were the moving force behind the injuries inflicted on Plaintiffs.

**Defendant Denver has a culture of disregarding inmate welfare and safety.**

108.    The cases set forth above are by no means the only examples of Denver's culture of unconstitutional disregard for inmate wellbeing and safety.

109.    In July 2014, Denver paid Jamal Hunter a $3.25 million settlement to resolve a case involving multiple instances of wrongdoing by Denver and DSD deputies. On July 18, 2011, Mr. Hunter was the victim of a fellow inmate's violent attack that was enabled by the complicity of Deputy Gaynel Rumer, who initially received a mere 40-day suspension. Part of Deputy Rumer's misconduct included failure to conduct proper rounds. Then, on July 31, 2011, Mr. Hunter was attacked and choked by Deputy Edward Keller. This incident was not reviewed despite Mr. Hunter's grievance until after the initiation of his lawsuit.

110.    In connection with the *Hunter* litigation, Judge Kane asked federal authorities in June 2014 to investigate the "patterns and practices" of the Denver police and sheriff's offices and suggested they were intimidating a key witness, saying that a Denver police investigation "smacks of a sham."

111.    Denver agreed as part of the *Hunter* settlement to conduct an external review of the DSD, which would consider the screening and hiring process for DSD deputies; best practices related to the discipline of DSD deputies; and best practices related to the functioning of DSD Internal Affairs Bureau ("IAB"). Unfortunately, this agreement to an external review has not cured Denver's on-going custom, policies and practices of indifference to inmate safety and welfare.

112.    Denver's illegal customs and practices illustrated by the *Hunter* case also existed during the incident outlined in this Amended Complaint, were the result of conscious and

deliberate policy choices on the part of Denver, and were the moving force behind the injuries

Plaintiffs suffered.

> **Defendant Denver has a culture of preventing guards from ensuring that inmates are provided appropriate medical care for serious medical needs, that are obvious even to a layperson, past notifying a nurse, and then blaming Denver Health when medical care is not provided.**

113.    The cases set forth above are by no means the only examples of Denver's culture

of unconstitutional disregard for inmate wellbeing and safety.

114.    In 2008, Denver deputies and Denver Health medical care providers were

deliberately indifferent to the obvious, serious medical needs of Emily Rae Rice. Ms. Rice was

involved in a car accident prior to being booked into the Denver Jail. While in the Jail, Ms. Rice

begged the Denver deputies and Denver Health nurses to provide her with medical care. They

continually refused to provide any care whatsoever. Ms. Rice ultimately died of internal

hemorrhages, which were completely treatable had the deputies or nurses responded to Ms.

Rice's pleas. After Ms. Rice's death, Denver destroyed, or otherwise tampered with, video and

other evidence, and engaged in a cover-up of the wrongdoing. After initially denying any

liability on any of the claims, Denver and Denver Health paid a total of $7 million and agreed to

many policy and training changes, which apparently were not wholly fulfilled. An investigation

conducted by the Colorado Department of Public Health and Environment cited Denver Health

for its mistreatment of Ms. Rice, the agency found that Denver Health engaged in "patient

dumping" when it discharged Ms. Rice without providing any medical care.

115.    As part of a negotiated settlement of legal claims arising from Ms. Rice's death,

Denver committed to implementing a series of policy changes called "Emily's Protocols." One

protocol specifically required:

> The determination to transport any individual to an area hospital from the jails without specific instructions by medical staff is reserved to Sergeants and higher ranks. Accordingly, department orders shall provide that all corrections staff be trained that they must alert a supervisor if they believe from a lay person's perspective that an inmate requires additional medical attention from the jail medical staff. If supervisors believe that an inmate requires additional medical attention, they are to take reasonable steps to resolve conflicts with medical concerns, including making direct calls to the on-call physician and/or utilizing 911 services to transport persons to area hospitals. If supervisory staff continue to believe that an inmate requires additional medical attention for a serious medical need, supervisory staff must alert a Division Chief.

Undersigned counsel negotiation this particular protocol because Denver deputies and sergeants in Ms. Rice's case abjectly failed to ensure she was provided appropriate medical care, which resulted in her death, and blamed their failure to do so on a rigid customary hierarchy at the jail, which they claimed forbid them from elevating inmate medical concerns to a higher-level if they had already contacted a nurse. In other words, it was custom, policy, and practice at the Denver Jail at the time, and continues to be to this day, that, even if it is obvious to jail staff that an inmate requires medical attention, jail staff will not take any steps to ensure inmates are provided medical attention above notifying the on-duty nurse at the jail.

116.   Emily's Protocols were designed by Plaintiffs' counsel to address specific failings by Denver deputies and sheriffs in Ms. Rice's case but, as illustrated by Ms. Sanchez's treatment at the Denver Jail, Denver has failed to implement these protocols despite being on notice that a deficiency in their customs, policies, and practices existed over *ten years ago*

117.   Denver's illegal customs and practices illustrated by the *Rice* case also existed during the incident outlined in this Amended Complaint, were the result of Denver's conscious and deliberate policy choices, and were the moving force behind the injuries Plaintiffs suffered.

**The Office Of The Independent Monitor's 2013 Report Demonstrates DSD's Custom, Practice, and Policy Of Failing To Discipline Its Employees, Which Has Led To Continued Failure To Provide Adequate Medical Care**

118.    In 2013, Denver's Office of Independent Monitor (OIM) filed a six-chapter report critiquing procedures within the Denver Police Department (DPD) and the Denver Sheriff's Department (DSD). Chapter two of the report detailed deficiencies in the manner in which the DSD handled prisoners' most serious grievances.

119.    The OIM analyzed more than 6,000 prisoners' grievances filed over the two- and half-year period of January 1, 2011 through June 30, 2013. Its focus was on grievances that alleged serious misconduct by guards. Both public policy and DSD directives dictate that serious misconduct committed by guards is to be reported to and investigated by the Internal Affairs Bureau (IAB). The OIM found that over 90% of the most serious grievances never made it to the IAB for investigation.

120.    Of the fifty-four grievances alleging serious misconduct by guards only nine were actually investigated by the IAB and of the nine only three were actually triggered by the original grievance. The other six were only investigated after the prisoner filed a separate complaint.

121.    Another problem identified by the OIM is that DSD policy requires a verbal resolution be attempted before a prisoner can file a written grievance. According to the report this limitation has the effect of discouraging prisoners from using the grievance process.

122.    The investigation revealed that the Inmate Handbook did not inform prisoners that an informal resolution was not required if their grievance alleges serious misconduct by a guard. The OIM also found that DSD's policy of rejecting grievances for procedural errors when a

31

guard is accused of serious misconduct was extremely problematic, and led to allegations of serious misconduct going uninvestigated.

123.    Interviews with employees revealed that guards consistently failed to file reports of serious misconduct with the IAB. When asked for a reason, guards referred to a memo, issued from an unknown source, that required them to first go to their supervisor.  The OIM was never able to locate the memo.

124.    The OIM also found that DSD customarily failed to analyze the data supplied by the grievances themselves and, therefore, failed to adequately supervise and discipline its employees based on the aggregate data.

**Independent analysts: Denver fails to properly supervise DSD deputies and properly staff its facilities.**

125.    On August 21, 2014, the DSD Training Task Force released its recommendations, which included: "Add more sergeants to improve the span of control and improve supervision of deputies while on duty."

126.    The recommendations referenced the following shortcoming within DSD: "Current span of control exceeds best practice of one supervisor for every 3-7 subordinates. Current ratio is 1:9.24" (emphasis in original).

127.    Independent Monitor Nick Mitchell stated that "many DDC sergeants spend the bulk of their shifts completing paperwork and managing each jail floor's staffing roster, instead of supervising deputies."

128.    IM Mitchell's letter continued: "DDC deputies with whom we spoke corroborated that supervision is often absent in the DDC . . . ."

129.    Similarly, the Hillard Heintze report noted: "Many deputies indicated that they did not have regular contact with their supervisors during their shifts . . . ."

130.    The report recommended that "DSD supervisors, in general, need to place a much higher priority on supervising employees and holding them accountable for their duties."

131.    In his letter, IM Mitchell concluded: "These supervisory gaps at the DDC, and the perception by deputies that they are not being supervised, reducing mentoring of deputies, diminish opportunities for the early identification of deputy performance problems, and create conditions that could foster misconduct."

132.    He recommended, among other things, "that the DSD review and enhance the training provided to new sergeants to ensure that it thoroughly prepares them to supervise deputies, and make available additional resources that will enable sergeants to be more effective at providing supervision . . . ."

133.    The DSD's October 31, 2014 Phase One Status Report for the DSD Reform Effort confirmed the findings of the Training Task Force and the Office of the Independent Monitor ("OIM"):

> As inmate populations have trended higher, the Department has experienced staffing shortages. Deputies work long hours — as many as 16 hours at a time — and are supervising up to 64 inmates . . . . Deputies often work alone at their posts. Their supervisors, Sergeants, are often required to spend much of their time conducting administrative work due to understaffing. The Department also is working to address a shortage of sergeants. Best practice is for each sergeant to supervise three to seven deputies and the current ratio is 1:9.

134.    In its March 2015 report, the Auditor also noted DSD's significant problem of overworking deputies and understaffing its jails:

135.    A 2014 assessment conducted by the City's Office of Human Resources ("OHR")
found that the average DSD employee worked approximately twenty-four hours of mandatory
overtime each week. According to the OHR report, when deputy sheriffs are required to work
overtime after completing a twelve-hour shift, the effects of individual stress and fatigue may
lead to "inappropriate behavior, bad decisions, and wrong choices on and off the job, resulting in
potential disciplinary problems."

136.    The Auditor further found that a flawed staffing methodology resulted in
consistent understaffing within DSD.

137.    The DSD Training Task Force's recommendations included changing shifts from
12 hours to 10 hours, changing the employee break structure, and training deputies on
anger/stress management.

138.    The policy failings identified above, including but not limited Denver's
inadequate training, supervision, and discipline of its law enforcement officers, were the result of
Denver's conscious and deliberate choices, existed at the time of the incident outlined in this
Amended Complaint, and were the moving force behind the injuries Plaintiffs suffered.

**Independent analysts: Delays and backlog at Internal Affairs have compounded
DSD's lack of accountability**

139.    In his September 10, 2014 letter to Councilman Lopez, IM Mitchell stated with
regard to Internal Affairs investigations:

> For several years, the OIM has registered its concern that it has taken too long for
> investigations into alleged deputy misconduct to be completed. As has recently
> been reported in the print media, the caseload and backlog in DSD Internal Affairs
> is growing, which is cause for additional concern. The lengthy timeline for
> investigating and resolving jail misconduct complaints at present is unacceptable
> for accused deputies, for the public, and for the investigators in DSD Internal
> Affairs who are working hard under challenging conditions.

140.    In its 2012 Annual Report, OIM had noted that increasing delays in completing internal affairs investigations "may prevent [the] department from acting quickly to correct or deter deputy misconduct, may lower morale, and tend[] to undermine public and department trust in the complaint process."

141.    On October 2, 2014, the DSD Discipline Task Force, which included Interim Sheriff Diggins, former Sheriff Wilson, and former Manager of Safety Al LaCabe, issued 32 recommendations, one of which identified "a need to increase the quality and speed of the DSD Internal Affairs process, giving priority to those cases in which inappropriate force, other inmate treatment issues, or deceptive conduct is alleged."

142.    In the fall of 2014, the DSD attempted to address the backlog of cases and increase the efficiency of IAB case by hiring retired Arapahoe County Sheriff Grayson Robinson to lead its IAB on an interim basis, in addition to six on-call investigators.

143.    The DSD also announced that it had created a new office, the Conduct Review Office, to increase the efficiency of reviewing discipline cases and to shorten the disciplinary process overall.

144.    Instead of improving the disciplinary review process, DSD worsened it. The report observed that the complaint handling process slowed down in 2014 compared to 2013. And, this signaled to DSD employees that there would be no consequences for their actions.

145.    The OIG Group report noted that as DSD "sought to handle the 45 old grievances that had not been properly investigated or reviewed, the caseload at IA grew, contributing to an already existing backlog of overdue cases that was the result of years of inadequate resources, internal leadership failures, and the lack of an effective system for monitoring investigations."

146.    The OIG Group report noted that "unlike many jurisdictions, Denver does not have a statute setting a limitations period on disciplinary actions against peace officers. As a result, there is no external deadline on when an investigation must be completed or discipline imposed."

147.    The OIR Group anecdotally "heard about cases languishing months and years with no work being done toward completion as investigators got overburdened and fell behind on their cases."

148.    For example, "[i]n 2014, Internal Affairs discovered over 100 informal complaints that had been languishing at the division level well past the 180-day deadline set by Department policy, and then learned that these investigations had been incorrectly assigned, so that some did not even know they were supposed to be working on them and they were essentially lost in the system."

149.    The OIR Group report concluded:

These sorts of delays undermine the purpose of a disciplinary system – to maintain the integrity of the agency while holding people accountable for their actions They likewise erode the public's trust in the Department's ability to police itself and weaken deputies' confidence in their leaders. When an agency imposes discipline years after an incident, it leaves one to question how seriously the agency takes the misconduct and diminishes the important of the disciplinary action, in that the lessons that should be learned from the incident have long since faded in memories.

150.    The policy failings identified above, including but not limited Denver's inadequate training, supervision, and discipline of its law enforcement officers, were the result of Denver's conscious and deliberate choices, existed at the time of the incident outlined in this Amended Complaint, and were the moving force behind the injuries Plaintiffs suffered.

**The OIM's Report On The Death Of Michael Marshall Demonstrates DSD's Custom, Practice, and Policy Of Failing To Discipline Its Employees, Which Has Led To Continued Failure To Ensure Inmate Safety and to Provide Adequate Medical Care**

151.    On March 19, 2018 (a few months before the events giving rise to this litigation), the OIM released a report entitled The Death of Michael Marshal, an Independent Review. In that report, the OIM found that the Denver IAB grossly mishandled its investigation into the circumstances surrounding Mr. Marshall's death. The OIM found that the IAB submitted the case to the OIM as a completed investigation despite the fact that it had not interviewed any of the deputies involved in Mr. Marshall's death. Additionally, during the IAB interviews of the nurses who failed to provide medical care to Mr. Marshall, the IAB investigators did not utilize critical evidence, including the video of the incident. The OIM concluded that when the IAB claimed it had concluded its investigation, it had abjectly failed to gather all, or even most, or the relevant facts necessary for resolution of the allegations.

152.    After IAB summarily closed the case without so much as investigating it, the OIM supplied IAB with substantial evidence of misconduct by both deputies and nurses in their mistreatment of Mr. Marshall. The information that IAB had in its possession at this time included the medical examiner's conclusion that Mr. Marshall had died of, among other things, complications from positional asphyxia due to physical restraint in a prone position, video showing one of the deputies applying pressure to Mr. Marshall's body for an extended period of time after he had already gone limp and vomited while retrained in handcuffs, leg irons, and by body weight, a statement by one of the nurses that she asked the deputy to relieve some of the pressure on Mr. Marshall's limp body and he refused, and substantial evidence that the

37

supervisor on scene witnessed excessive force being used and failed to intervene to prevent the inappropriate use of force.

153.    Despite being in possession of this information, IAB took no further steps to investigate and closed the investigation without further review.

154.    The OIM also found that the Department of Safety ("DOS") abjectly failed to properly and appropriately discipline those involved in the killing of Mr. Marshall. The OIM found that the DOS failed to discipline three on-scene supervisors who watched their subordinates use grossly excessive force without so much as questioning the force used. Further, the OIM found that the discipline given to a deputy who used the force that killed Mr. Marshall was woefully inadequate, and that the discipline imposed did not reflect the severity of the force used.

155.    The OIM found that the DOS had failed to adequately train its deputies. Specifically, it found that the DSD had failed to provide adequate training on the medical condition excited delirium.

156.    The OIM also found that DSD's policies inadequate as they related to resolving urgent medical and safety concerns that are in conflict. In other words, DSD's policies and training for situations where security concerns and medical concerns in correctional settings conflict were inadequate.

157.    Finally, the OIM found that DSD fails to learn from its past mistakes, and that there is a custom, policy, and practice of minimizing past mistakes and not using those mistakes as an opportunity to correct culture and issues within the DSD. Specifically, the OIM pointed to the fact that, while the criminal investigation was still underway, a deputy who had used the

force that killed Mr. Marshall was nominated by his supervisor for DSD's Life Saving Award.

The OIM noted that the deputy had been nominated for this award even though Mr. Marshall had

died. Importantly, the OIM noted that a DSD trainer (and many others within DSD) continued to

believe that the deputies and nurses had acted appropriately and in compliance with DSD

policies while killing Mr. Marshall.

## STATEMENT OF CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – 8th and/or 14th Amendment**
**Deliberately Indifferent Medical Care**
**(Plaintiffs against all Defendants)**

158.    Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if
fully set forth herein.

159.    Ms. Sanchez and Baby J.S.M. were citizens of the United States, and Defendants
to this claim are persons for the purposes of 42 U.S.C. § 1983.

160.    Ms. Sanchez was a pre-trial detainee. Baby J.S.M. was not accused (or convicted
of) any crime.

161.    As a pre-trial detainee, Ms. Sanchez was protected from deliberate indifference to
her serious medical needs by the Fourteenth Amendment. Baby J.S.M. was also protected from
deliberate indifference to his serious medical needs by the Fourteenth Amendment

162.    Under the Fourteenth Amendment, Ms. Sanchez and Baby J.S.M. are also protected
from conduct that is not rationally related to a legitimate nonpunitive governmental purpose or
actions that appear objectively excessive in relation to that purpose under *Kingsley v. Hendrickson*,
135 S. Ct. 2466, 2473 (2015).

163.    To the extent she was under any conviction, Ms. Sanchez was also protected from

deliberate indifference to her serious medical needs by the Eigth amendment.

164.    Each Defendant knew or should have known of these clearly established rights at the time of Ms. Sanchez's delivery of Baby J.S.M.

165.    Each individual Defendant to this claim, at all times relevant hereto, was acting under color of state law.

166.    Defendants knew of and disregarded the excessive risks associated with Ms. Sanchez's and Baby J.S.M.'s serious medical conditions and nonetheless, with deliberate indifference, decided not to obtain a medical evaluation or necessary urgent medical care. They did so despite being expressly aware of Plaintiffs' serious medical needs, obvious need for the same, and recklessly disregarding a substantial risk of physical harm to Plaintiffs.

167.    When Ms. Sanchez, and others acting on her behalf, alerted each individual Defendant to her need and Baby J.S.M.'s need for medical assistance, Defendants acted with deliberate indifference to both Plaintiffs' readily apparent need for medical attention and both Plaintiffs' constitutional rights by refusing to obtain and provide any medical treatment.

168.    These Defendants acted with deliberate indifference to Ms. Sanchez's medical condition, including her pregnancy, labor, delivery, and obvious need for medical attention. These Defendants acted with deliberate indifference to Baby J.S.M.'s medical conditions, including but not limited to post-delivery and natal care, and obvious need for medical attention.

169.    All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

170.    The acts or omissions of each Defendant were the legal and proximate cause of Ms. Sanchez's and Baby J.S.M.'s injuries.

171.    At all times relevant to the allegations in this Amended Complaint, Denver and its officials were acting under color of state law and had a non-delegable duty to provide constitutionality adequate medical care for inmates and for Baby J.S.M.

172.    At all times relevant hereto Denver Health was willfully a participant in a joint activity and acting under color of state law, as the legal and functional equivalent of a municipality providing medical care to inmates and any child born to them while in custody.

173.    The intentional acts or omissions of Denver and Denver Health were conducted within the scope of their official duties and employment.

174.    Denver's and Denver Health's deliberately indifferent and unconstitutional policies, customs, and/or practices regarding provision of constitutionally adequate medical care as described were the moving and proximate cause of Plaintiffs' injuries.

175.    Denver and Denver Health deliberately indifferently failed to properly train and supervise their employees to provide necessary medical care to detainees at the Denver County Jail.

176.    The failures in training, supervision, and policy regarding providing necessary medical assessment and care were so obvious that the failure to provide medical assessment and care was deliberately indifferent to the rights of Plaintiffs and the public.

177.    Denver's and Denver Health's deliberately indifferent customs, and failures to train/supervise, are all actionable policy decisions that were moving forces and proximate causes of the violation of Plaintiffs' constitutional rights.

178.    The intentional actions and inaction of each individual Defendant, and policies, customs, and practices of Denver and Denver Health as described herein were also moving forces

in and proximate causes of the deprivation of Plaintiffs' rights to due process and of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused Plaintiffs other damages.

179.    Denver is also directly liable for its own policies and actions that are moving forces in this constitutional injury under the contract between Denver and Denver Health, as Denver participated in negotiating and sponsoring this contract despite the knowledge of Denver Health's pervasive pattern of civil rights and human rights violations.

180.    As a direct result of Defendants' unlawful conduct, Ms. Sanchez and Baby J.S.M. suffered extreme physical and mental pain and suffering.

181.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest, and costs as allowable by law.

182.    In addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages against individual Defendants, in that the actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiffs.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. §1983**
**14th Amendment Substantive Due Process Violation – Special Relationship Liability**
**(Baby J.S.M. Against All Defendants)**

183.    Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein.

184.    Defendants, at all relevant times hereto, were acting under color of state law.

185.    At all relevant times to this Amended Complaint, Baby J.S.M. had a clearly established constitutional right under the Fourteenth Amendment to the United States

Constitution not to be deprived of liberty without due process of law, which encompassed his right to reasonable medical care.

186.    Defendants' actions and inactions, as described herein, deprived Baby J.S.M. of his clearly established constitutional right to be free from deprivations of liberty without due process of law.

187.    Baby J.S.M. had a special relationship with Defendants, in that he was in Defendants' legal custody and detention against his will at the time of his birth, and unable to provide or seek care for his own serious medical needs. That special relationship triggered an affirmative duty to protect Baby J.S.M. from harm.

188.    Defendants breached their affirmative duty to protect Baby J.S.M. by failing to ensure his safety from the risk of harm that lack of medical care presented, even though Defendants were on notice that Baby J.S.M.'s birth was imminent, and that Baby J.S.M. required special care during and immediately following his birth. These actions or inactions substantially depart from accepted professional judgment, practice or standards, and from the duty to provide reasonable care under all the circumstances and created the conditions that caused the lack of medical care provided to Baby J.S.M.

189.    Defendants' conduct, as described herein, was intentional, willful, and wanton, and shocks the conscience.

190.    The acts and omissions of the individual Defendants were engaged in pursuant to the custom, policy, and practice of Defendants Denver and Denver Health, which failed to adequately and appropriately supervise or train its agents with respect to provision of medical care.

191. Defendants' acts and omissions caused Baby J.S.M. damages in that J.S.M. suffered physical and mental injury, pain, discomfort, and unnecessary risks because their acts and failures to act. Thus, Defendants' conduct resulted in a denial of Baby J.S.M.'s substantive due process rights.

192. Defendants' acts or omissions were the legal and proximate cause of J.S.M.'s damages.

### THIRD CLAIM FOR RELIEF
### Medical Negligence/Negligent Medical Care and Treatment
### (Plaintiffs Against Defendants Denver Health, Herch, Chacon, Gilkey, and Warmus)

193. Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein.

194. At all times relevant to this action, while they were in the Denver County Jail, Diana Sanchez and Baby J.S.M. were under the medical responsibility, care and treatment of the Denver Health and its nurses.

195. The Defendants identified above had a nurse-patient relationship with Plaintiffs at all times pertinent to this Amended Complaint.

196. During the course of this medical treatment, Denver Health Defendants were negligent in their care and treatment of Plaintiffs.

197. Denver Health Defendants had a duty to provide reasonable medical care and treatment to detainees at Denver County Jail, including Plaintiffs.

198. Denver Health Defendants breached their duty of care and were negligent when they failed to provide Plaintiffs with reasonably obtainable and necessary medical treatment.

199.     With respect to their care and treatment of Diana Sanchez and Baby J.S.M., Denver Health Defendants owed each Plaintiff a duty to exercise that degree of care, skill, caution, diligence and foresight exercised by and expected of nurses in similar situations.  The Denver Health Defendants deviated from that standard of care and were negligent in failing to properly assess, diagnose and treat Plaintiffs.

200.     The Denver Health Defendants were negligent in failing to properly assess, diagnose and treat Diana Sanchez and Baby J.S.M. as described herein.

201.     The Denver Health Defendants were negligent in failing to properly cause Diana Sanchez and Baby J.S.M. to be transported to a hospital in a timely manner, as described herein.

202.     As a direct and proximate result of the conduct of the Denver Health Defendants, Plaintiffs suffered significant physical and mental pain and suffering and other damages.

203.     Plaintiffs suffered and continue to suffer economic and non-economic damages due to Defendants' negligent conduct toward them, including non-economic damages impairment in the quality of their lives, inconvenience, discomfort, pain and suffering, and extreme emotional stress.

### FOURTH CLAIM FOR RELIEF
### Negligent Operation of A Correctional Facility
### (Plaintiffs Against Defendant Denver Health)

204.     Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein.

205.     Under Colo. Rev. Stat. § 24-10-106(1)(b), Denver Health was required to provide Ms. Sanchez and Baby J.S.M. "medical care necessary for basic health." *Nieto v. State*, 952 P.2d 834, 839 (Colo. App. 1997). Denver and Denver Health owed a duty to Ms. Sanchez and Baby

J.S.M. to house them "in a safe and effective manner." *Nieto*, 952 P.2d at 839; *see also Pack v. Arkansas Valley Correctional Facility*, 894 P.2d 34, 37 (Colo. App. 1995); *Howard v. City & County of Denver*, 837 P.2d 255, 257 (Colo. App. 1992) ("duties in keeping jail are to receive and safely detain every person duly committed therein"). Under C.R.S. § 16-3-401, "persons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

206.    Denver Health had a duty to exercise reasonable care in the operation of the Denver County Jail to ensure that it was run in a manner that provided the detainees under their care with reasonable medical care and treatment.

207.    Denver Health breached its duty to exercise reasonable care in the operation of the Denver County Jail.

208.    Denver Health knew or should have known the Denver County Jail was being operated in a manner likely to harm Denver County Jail detainees in need of medical care, including Plaintiffs.

209.    In failing to exercise reasonable care in the operation of the Denver County Jail, Denver Health was negligent.

210.    The negligence of Denver Health proximately caused Plaintiffs significant physical and mental pain and suffering and other damages.

**FIFTH CLAIM FOR RELIEF**
**Negligent Training and Supervision**
**(Plaintiffs Against Defendant Denver Health)**

211.    Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein.

212.    Denver Health had a duty to exercise reasonable care in the training and supervision of its employees in a manner that provided the detainees under its care with reasonable medical care and treatment.

213.    Denver Health breached its duty to exercise reasonable care in the training and supervision of its subordinate employees.

214.    Denver Health, because it knew or should have known of the lack of supervision, experience and training among its employees, also had reason to know that its employees were likely to harm Denver County Jail detainees in need of medical care, including Plaintiffs.

215.    In failing to exercise reasonable care in the training and supervision of its employees relative to their providing reasonable medical care and treatment, Denver Health was negligent.

216.    The negligence of Denver Health proximately caused Plaintiffs significant physical and mental pain and suffering and other damages.

**SIXTH CLAIM FOR RELIEF**
**Outrageous Conduct**
**(Plaintiffs Against Defendants Herch, Chacon, Gilkey, and Warmus)**

217.    Plaintiffs hereby incorporate all of the paragraphs of this Amended Complaint as though fully incorporated herein.

218.    The behavior of Defendants in failing to provide *any* medical care to Plaintiffs

was so outrageous and so extreme that reasonable members of the community would regard such

behavior as atrocious,

219.    Defendants knew or should have known that their conduct would cause the

Plaintiffs severe emotional distress.

220.    Defendants' described actions and inactions were utterly intolerable, and would

lead a reasonable member of the community to conclude that their conduct was extreme and

outrageous.

221.    As a result of Defendants' conduct, Plaintiffs have suffered damages and losses,

including severe emotional distress and pain and suffering.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their

favor and against Defendants, and award them all relief as allowed by law and equity, including,

but not limited to the following:

a.  Declaratory relief and injunctive relief, as appropriate;

b.  Compensatory damages, including, but not limited to those for past and future
    pecuniary and non-pecuniary losses, physical and mental pain, humiliation,
    discomfort, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and
    sense of security and individual dignity, and other non-pecuniary losses;

c.  Punitive damages for all claims as allowed by law in an amount to be determined
    at trial;

d.  Issuance of an Order mandating appropriate equitable relief, including but not
    limited to:

    i.   Issuance of a formal written apology from each Defendant to Plaintiffs;

    ii.   The imposition of policy changes designed to avoid future similar misconduct by Defendants;

    iii.   Mandatory training designed to avoid future similar misconduct by Defendants;

e.   Pre-judgment and post-judgment interest at the highest lawful rate;

f.   Attorney's fees and costs; and

g.   Such further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 18th day of February 2020.

KILLMER, LANE & NEWMAN, LLP

*s/ Mari Newman*
_____
Mari Newman
Andy McNulty
1543 Champa Street, Suite 400
Denver, Colorado 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
mnewman@kln-law.com
amcnulty@kln-law.com

49